UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :  No. 3:18CR272(JAM)
                                :
          v.                    :
                                :
DREW RANKIN,                    :
JAMES SULLIVAN,                 :
JOHN BILDA,                     :
EDWARD DEMUZZIO, and            :
EDWARD PRYOR,                   :
                                :  New Haven, Connecticut
                  Defendants    :  October 25, 2021
                                :
- - - - - - - - - - - - - - - - x
```

<u>PRETRIAL CONFERENCE AND MOTIONS HEARING</u>

BEFORE:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

```
 1   A P P E A R A N C E S:

 2

 3        FOR THE GOVERNMENT:

 4            OFFICE OF THE UNITED STATES ATTORNEY
                 157 Church Street, 25th Floor
 5               New Haven, Connecticut 06510
             BY:  SARAH P. KARWAN, AUSA
 6               TARA E. LEVENS, AUSA
                 MICHAEL S. McGARRY, AUSA
 7               JONATHAN N. FRANCIS, AUSA

 8        FOR DREW RANKIN:

 9            IZZARD KINDALL & RAABE LLP
                 29 South Main Street, Suite 305
10               West Hartford, Connecticut 06107
             BY:  CRAIG A. RAABE, ESQ.
11               CHRISTOPHER M. BARRETT, ESQ.

12

13        FOR JAMES SULLIVAN:

14            HALLORAN & HALLORAN
                 9 Lewis Street, 1st Floor
15               Hartford, Connecticut 06103
             BY:  R. BARTLEY HALLORAN, ESQ.

16            SANTOS & LaLIMA
                 51 Russ Street
17               Hartford, Connecticut 06106
             BY:  TRENT ALAN LaLIMA, ESQ.

18

19        FOR JOHN BILDA:

20            COWDERY & MURPHY LLC
                 280 Trumbull Street, 22nd Floor
21               Hartford, Connecticut 06103
             BY:  THOMAS J. MURPHY, ESQ.
22               JAMES JOHN HEALY, ESQ.

23

24

25
```

1    A P P E A R A N C E S (Continued):

2

3        FOR EDWARD DEMUZZIO:

4            JACOBS & DOW LLC
                 350 Orange Street
                 New Haven, Connecticut 06503-0606
5            BY:  WILLIAM F. DOW, ESQ.

6            GREEN & SKLARZ LLC
                 One Audubon Street, 3rd Floor
7                New Haven, Connecticut 06511
             BY:  KENNETH ROSENTHAL, ESQ.

8

9        FOR EDWARD PRYOR:

10           FINN DIXON & HERLING LLP
                 Six Landmark Square
11               Stamford, Connecticut 06901
             BY:  DANIEL SCOTT NOBLE, ESQ.
12               ELIAS LARIS, ESQ.
                 ALFRED U. PAVLIS, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **10:04 A.M.**

2                  THE COURT:  We're here today for a pretrial

3      conference in the matter of United States of America v.

4      Drew Rankin, James Sullivan, John Bilda, Edward DeMuzzio,

5      and Edward Pryor.

6                  Appearance of counsel for the government,

7      please.

8                  MS. KARWAN:  Good morning, Your Honor.  I will

9      go through the introductions.

10                 Sarah Karwan appearing on behalf of the

11     United States.  With me are AUSAs Tara Levens, Michael

12     McGarry, and Jonathan Francis joining us for today's

13     proceeding.

14                 In the front row, what will be the continuation

15     of the jury box, we have Special Agents Brandon Franson

16     and Eric Wethje of the IRS, we have Amy Konarski of our

17     office, and Special Agents Marc LaFrance and James

18     Kaminski of the FBI.

19                 THE COURT:  Good morning.

20                 And let's go, I guess, one by one.

21                 Mr. Raabe.

22                 MR. RAABE:  Good morning, Your Honor.  Craig

23     Raabe and Christopher Barrett for Mr. Rankin who is

24     present.

25                 THE COURT:  Good morning.

```
1            And Mr. Rankin, are you doing okay today, sir?

2            DEFENDANT RANKIN:  Yes, sir.

3            THE COURT:  And for Mr. Sullivan.

4            MR. HALLORAN:  Good morning, Your Honor.

5   Attorney Bart Halloran and Trent LaLima for Mr. Sullivan

6   who is present in the courtroom.

7            THE COURT:  Mr. Sullivan, are you okay today,

8   sir?

9            DEFENDANT SULLIVAN:  I'm just fine, Your Honor.

10           THE COURT:  Thank you.

11           For Mr. Bilda?

12           MR. MURPHY:  Good morning, Your Honor.  Thomas

13   Murphy and James Healy for John Bilda who is present with

14   us.

15           THE COURT:  Good morning.

16           Mr. Bilda, are you doing okay today, sir?

17           DEFENDANT BILDA:  Yes, I am.

18           THE COURT:  All right.  Please be seated.

19           And for Mr. DeMuzzio?

20           MR. DOW:  Good morning, Your Honor, William Dow

21   and Kenny Rosenthal for Mr. DeMuzzio.  He has chosen not

22   to be here today.  I can inform the Court he is doing

23   well.

24           THE COURT:  I'm glad to hear that.  And good

25   morning to you.
```

1            And for Mr. Pryor?

2            MR. NOBLE:  Good morning, Your Honor.  Daniel

3   Noble, Alfred Pavlis, and Elias Laris for Mr. Pryor who is

4   present here in the courtroom.

5            THE COURT:  Mr. Pryor, good morning.  Are you

6   doing okay today, sir?

7            DEFENDANT PRYOR:  Yes, sir.

8            THE COURT:  All right.  And we have, I guess, a

9   lot of things to cover today.  I tried to send out a list

10  to you of what we hope to cover.  I'm open to anything

11  else the attorneys want to talk about.

12            I thought what we would want to do is probably

13  to talk first about just general courtroom layout.  You

14  can see the courtroom looks quite a bit different than it

15  usually does.  We removed much of the seating, the old

16  wooden seating, to allow counsel and everybody more room.

17  We are also augmenting and using the hallway area with the

18  doors open.  So our plan is essentially to make that part

19  of the -- effectively part of the courtroom, especially

20  for public viewing, and we anticipate there will be video

21  and audio available out there.

22            But I just wanted to check with people.  You can

23  see where the jury box is and what our plan is there in

24  terms of probably having around eight jurors in the

25  regular box and then another eight jurors in the back.

1            I'll make a record that today and throughout the

2    trial proceedings, all of us right now are proceeding with

3    our masks on.  My rule about masks is if counsel is

4    addressing the Court and they feel that they want to

5    remove the mask for purposes of addressing the Court,

6    they're welcome to do so.  Equally for witnesses.  It's a

7    witness choice, in my view, whether they wish to remove

8    the mask.  They should just be told that as a routine

9    matter.  Once in a while I may do the same as well.  If

10   there's any concerns about that, happy to talk about that.

11           Anything to raise in terms of courtroom layout

12   and the like?  Is everybody comfortable?  We're doing the

13   best we can with the space that we have, I think.  So far,

14   any concerns?

15           Silence.  Great.

16           So the next issue to talk about is the jury

17   selection procedure.  I know I met with counsel some

18   months ago, I think I talked this through.  I'm happy to

19   answer any additional questions you might have about the

20   procedure.

21           We'll be doing jury selection downstairs in

22   Courtroom 1.  We'll be bringing in probably around 30 or

23   so per session, for the morning session and afternoon

24   session.  I follow a fairly established routine in terms

25   of giving an initial case statement, we'll talk about that

1   in a moment.  Having counsel introduce themselves and

2   their clients, identify the likely witnesses, other names

3   that might come up at trial, people with whom counsel work

4   in their firm.  Then to move through the standard jury

5   questionnaire that I sent out to you as well as additional

6   questions -- I know I got comments back from defense on

7   those -- as well as initial case statement.  And then our

8   hope is and our reasonable expectation is after doing up

9   to four of these sessions on Tuesday and Wednesday in the

10  morning and afternoon, we'll be prepared to do a final

11  jury selection on the morning of Thursday morning.

12          Any questions generally about just jury

13  selection procedure?

14          Okay, great.

15          And then I guess what we should do is talk about

16  the jury selection materials, if you'd like.  I don't know

17  if the government -- and I apologize if I didn't receive

18  anything back from the government.  Did the government

19  have concerns about what was sent out by the Court with

20  respect to the initial case statement?  Let's focus on

21  that.

22          MS. KARWAN:  No concerns with what the Court has

23  proposed, Your Honor.

24          THE COURT:  Would somebody like to speak on

25  behalf of defendants with respect to the initial case

1   statement?  I have a red line version here.

2          MR. RAABE:  I don't think we have anything to

3   offer.  We think that the changes are self-explanatory,

4   but I'm happy to answer any questions if the Court has

5   them.

6          THE COURT:  So I take it that the change with

7   respect to the intentional misapplication prong of the

8   statute, that might be dependent in part -- I guess to the

9   extent we're going to be talking about a lot of motions

10  this afternoon and perhaps later this week, is there great

11  prejudice to you from even mentioning it in an oral

12  statement to the jurors basically reciting what the

13  language of the statute says?

14         MR. RAABE:  For the reasons in motion in limine,

15  Your Honor, we think it should not be part of the case and

16  would be prejudicial to mention to the jurors and would

17  confuse them later.

18         THE COURT:  I understand.  Okay.

19         And anything else?

20         You just want to mention that CMEEC is located

21  in Norwich and that it assists its member municipality

22  electric utilities purchase electricity and does not

23  provide electricity directly to consumers.

24         MR. RAABE:  We think that's more factually

25  accurate than the Court's initial draft, Your Honor.

1          THE COURT:  The government's view on that?

2    Ms. Karwan?  Do you have a copy of the red line?

3          MS. KARWAN:  I do, Your Honor.

4          Your Honor, as I said, we were happy with the

5    Court's proposal, and I think it comes straight from the

6    indictment.  I'm not sure that I understand the

7    difference, but I do think we have an objection to the

8    extent that -- and I know this is subject to one of the

9    motions in limine, the sort of erasure, if you will, of

10   the member towns present from the statement.

11         THE COURT:  I see.  All right.  I'll consider

12   that as well.

13         And then just looking at the rest of the

14   comments there?

15         MR. RAABE:  One thing I'll highlight for you

16   that I think is very important and a view shared strongly

17   by all of the defendants is the change at the end of the

18   next paragraph that the trips allegedly did not relate to

19   CMEEC business and were taken solely for the personal

20   benefit of the defendants and others close to them.  This

21   issue is going to pervade this trial, I think.  We believe

22   if the statute were read to permit a conviction on kind of

23   a mixed use, part business/part personal, that the statute

24   would be rendered unconstitutionally vague, it wouldn't

25   provide fair notice to Mr. Rankin and codefendants as to

1    what is legal and illegal.  It's critically important at

2    this stage and every stage to make sure the jury knows

3    that the conduct alleged has to be solely personal in

4    order to convict.

5              THE COURT:  I see.

6              Government?

7              MS. KARWAN:  Your Honor, the government objects

8    to that inclusion of "solely."  That's not the law.  The

9    government is responsible and the jury will be instructed

10   that if the defendants took wrongfully $5,000 or more,

11   then they violated the law.  There are a number of trips

12   charged.  For example, the government's concerned that

13   this inclusion of the language suggests that every one of

14   the allegations in the indictment would have to be proven

15   true in order for the indictment to be sustained, and

16   that's not the law.  It's $5,000 or more.  We don't want

17   to get into a situation where the defendants are alleging

18   that legally if someone mentioned the word "kilowatt" on a

19   trip that that was business-related and therefore the jury

20   would have to essentially be directed to return its

21   verdict a certain way.

22             THE COURT:  I see.

23             I'm going to take this into consideration.  I'll

24   just underscore that my purpose in giving this initial

25   case description to the jury is basically to alert them to

1    what generally the case is about.  I'm not giving them a

2    written copy of this.  I know that there are many, many

3    finer points in terms of the issues in terms of what the

4    government has to prove or must prove.  And so I'm not

5    trying to take one side or another so much on the points

6    that are currently in dispute between the parties.  So I'm

7    just really trying to make it intelligible, frankly, for

8    the jurors coming in and hearing about the case for the

9    very first time.  So to the extent that I rule one way or

10   another, I'm going to revise this statement again, but to

11   the extent I adopt one phrasing or another, it's certainly

12   not to suggest that I have definitively taken a position

13   on this with respect to what would be the Court's position

14   as to future evidentiary rulings or with respect to jury

15   instructions.

16            Anything else you want to highlight?

17            MR. RAABE:  The next paragraph, Your Honor, we

18   had two purposes in the changes.  One, to better explain

19   what the defense will be.  We thought that the Court's

20   version was too truncated and, frankly, could make it

21   about the same size as the description.

22            THE COURT:  Understood.  Okay.

23            Do you have a concern about that, Ms. Karwan?

24            MS. KARWAN:  No, Your Honor, other than I do

25   think it should be clear that "federal" be kept in as

1    opposed to "the law."

2              THE COURT:  I couldn't hear that last part.

3              MS. KARWAN:  In terms of the last sentence,

4    "federal law" should be kept in instead of "the law."

5    That would be the only objection.

6              THE COURT:  Okay.

7              Do you have a concern about that, Mr. Raabe?

8              MR. RAABE:  No, Your Honor.

9              THE COURT:  Thank you.  I'll take another look

10   at these.  We'll issue another revision and get that out

11   to counsel hopefully later this afternoon.

12             All right.  That gets us to the next document,

13   the juror questionnaire.  It's pretty much the standard

14   that I use except I decided, in light of the concerns that

15   are raised here about the possibility that some of the

16   members of the prospective jury might be from the affected

17   towns, I'm running it back to January 1 of 2014.

18             Any concerns about the juror questionnaire?

19             MS. KARWAN:  No, Your Honor.

20             MR. RAABE:  The only concern, Judge, we are

21   concerned, based on the government's witness list, our

22   potential anticipated witnesses, and the large number of

23   exhibits that are at play right now, the case is very

24   likely to take longer than originally anticipated and that

25   we would not be done by November 23.  And we're concerned

1    that if it goes long and there's a defense case, the

2    jurors are going to use it against us.  We would like to

3    have a more wholesome discussion of the length of the

4    trial now.

5             THE COURT:  Let's have that discussion.  Tell

6    me, anything more to elaborate on?

7             MR. RAABE:  It just seems with the number of

8    witnesses that the government has said are likely, with

9    our anticipated witnesses, we don't think the number of

10   trial days allotted is sufficient.  It probably has the

11   potential to go another week.

12            THE COURT:  I see.  And so your thought would be

13   to include dates that go out past Thanksgiving then?

14            MR. RAABE:  Let me look at my calendar a second,

15   Your Honor.

16            I think we'd go into that following week after

17   Thanksgiving.

18            THE COURT:  All right.

19            Ms. Karwan.

20            MS. KARWAN:  Your Honor, the government's

21   estimate of its case in chief, which I think we said was

22   two weeks, has not changed.  There are a number of

23   witnesses.  I think many will be very short.  Obviously it

24   will depend on the length of cross-examination.  The

25   exhibit list numbering goes high, Your Honor, because of

```
 1    the convention we used.  Overall, I don't think it's a
 2    significant amount of exhibits.  It's 200 or 300 exhibits,
 3    but they're not particularly voluminous and, you know, for
 4    example, bank records, we're putting in all of the bank
 5    records but then just have a witness testify as a summary
 6    on the voluminous records.
 7                THE COURT:  All right.
 8                So I guess, Mr. Raabe, do you think that -- and
 9    I know it's reading tea leaves.  If the government does
10    indeed wrap up its case in two weeks or ten days of trial
11    evidence, do you have an estimate how many days the
12    defense case would be?
13                MR. RAABE:  I would think, Your Honor, so if the
14    government wraps up --
15                THE COURT:  I understand it's hard to predict
16    because you don't know how things will go.
17                MR. RAABE:  I think the defense case has the
18    potential to go at least a week and maybe more, which buts
19    us up against the 23rd.  Our concern is to alert the
20    jurors that it could go past Thanksgiving so we don't get
21    hung up on it.
22                THE COURT:  It could be that we -- that we ask
23    jurors -- I could pose this.  I've had this situation
24    arise before where I could ask in the additional jury
25    questions, I could ask in the event that there's an
```

1    unanticipated delay or for some reason we run over time,

2    does anybody have a conflict during the week of

3    November 29 so that you have that information, basically

4    from November 29 to December 3rd, that would be the week

5    after Thanksgiving, so that we would have the information

6    in terms of if somebody has some firm plans that they're

7    away, at least that would be known to us and we could make

8    a decision about that when it comes time to consider

9    suitability for jury service.

10           MR. RAABE:  I think our preference, Your Honor,

11   would be to say it could go to the 30th, we're hoping to

12   end before Thanksgiving, to do the inverse of what the

13   Court is suggesting.

14           THE COURT:  I see.  Okay.

15           In other words, to say it could go to the 3rd of

16   December?

17           MR. RAABE:  Whatever day that week.  I don't

18   think we take two full weeks beyond the government's case,

19   but into that week after Thanksgiving I think is a real

20   possibility.

21           THE COURT:  Ms. Karwan, any thoughts on this?

22           MS. KARWAN:  It doesn't seem that it would hurt,

23   Your Honor.

24           THE COURT:  So we should then extend the dates

25   on the form itself, okay.  We'll do that on the jury

 1    selection form.

 2              There's a typo on the form for the spelling of

 3    Mr. DeMuzzio's name, and we'll correct that as well.

 4              MR. LaLIMA:  Your Honor, I did have two

 5    additional things to address.

 6              THE COURT:  Yes.

 7              MR. LaLIMA:  I think we had provided this to the

 8    Court in a revised draft.  One of them is in Question 5, I

 9    think it's missing the Town of Wallingford which was a

10    town covered by CMEEC.

11              THE COURT:  Let me just hold on a second.  I'm

12    not quite to the additional jury questions yet.

13              MR. LaLIMA:  Apologize.

14              THE COURT:  I'll want to hear from you on that.

15              Anything else on just the one-page jury

16    questionnaire?

17              MR. RAABE:  No, Your Honor.

18              THE COURT:  Now we're on to additional jury

19    questions.  And let me, I think, go through, if I can, the

20    red line concerns that are stated and then handle any

21    other additional issues.

22              So it looks like -- I don't know if, Mr. LaLima,

23    you're going to be carrying the --

24              MR. LaLIMA:  I can.  I filed the initial

25    voir dire request.

1              THE COURT:  Tell me what's your concern.

2              MR. LaLIMA:  In Number 5, I suppose it doesn't

3     really matter what the title of it is if they don't get a

4     copy of this, if they're only read the questions.  It

5     doesn't matter if it says member towns.  It's missing the

6     Town of Wallingford in the list of towns which was

7     covered.

8              THE COURT:  Sure.

9              MR. LaLIMA:  Number 8, we'd like to ask --

10             THE COURT:  Let me just stop there.

11             Is it okay with the government to include

12    Wallingford?

13             MS. KARWAN:  That's fine, Your Honor.

14             THE COURT:  And then Number 8?

15             MR. LaLIMA:  Number 8, if we're going to ask

16    about law training and education, we think asking about

17    ethics training and education might also be helpful in

18    determining what level of background in these legal issues

19    or legal adjacent issues jurors have.

20             THE COURT:  I wasn't sure what you meant by

21    ethics training.  In what sense?

22             MR. LaLIMA:  We are asking, for instance,

23    whether or not in Number 6 whether they've served as a

24    corporate officer, director.  Perhaps in that sense

25    they've attended seminars or some sort of other training

1    on corporate ethics or fiduciary duty and other things

2    like that.  I think that would be information that those

3    jurors would have that they may bring into this case.

4            THE COURT:  So you would want it to say or

5    corporate ethics?

6            MR. LaLIMA:  Corporate ethics would be fine,

7    Your Honor.  I think that would resolve it, yes.

8            THE COURT:  So would this mean that basically

9    anybody who has been in -- works for a company and has

10   gotten sexual harassment training, that that would be

11   something we need to --

12           MR. LaLIMA:  I don't think sexual -- I suppose

13   if a juror were to answer that relatively broadly, they

14   might say yes if they've attended sexual harassment

15   training.  We could follow up, Your Honor, to ensure we're

16   not getting people who just attended a general seminar on

17   workplace harassment or workplace issue.  We're looking

18   for people who have learned about fiduciary duties to

19   companies.  We don't want people that may bring that in

20   and be unwilling to put that out of their mind when they

21   decide this case.

22           THE COURT:  I see.  So --

23           MR. LaLIMA:  Follow-up questions would -- for

24   anyone that answers "yes" would resolve it.

25           THE COURT:  So are you -- could it ask whether

```
 1    people have received -- the problem with follow-up

 2    questions is that if you ask a question and suddenly

 3    80 percent of the 30 people raise their hand, it ends up

 4    being very time-consuming to go one by one with the

 5    follow-up questions.  So what if it said specialized

 6    training about fiduciary duties of corporate officers and

 7    board members?

 8              MR. LaLIMA:  Yes, I think that would cover what

 9    we need, Your Honor, without being overbroad to catch too

10    many fish in the net.

11              THE COURT:  Government?

12              MS. KARWAN:  That's fine, Your Honor.

13              THE COURT:  All right.  Let's see.  It looks

14    like for Paragraph 17 you had another suggestion that I

15    think appeared fine to me, but does the government have a

16    concern about Paragraph 17?

17              MS. KARWAN:  No, Your Honor.

18              THE COURT:  We'll take that.

19              And then I'm not sure there's any other

20    concerns.

21              MR. LaLIMA:  That was it, Your Honor.  Thank

22    you.

23              THE COURT:  All right.  I think that gets us to

24    the, among the many motions we have, we have two I think

25    that most directly implicate jury selection issues.
```

1                    And Mr. Dow?

2                    MR. DOW:  Just briefly, Your Honor.  I noticed

3     from Your Honor's procedures as laid out in the website,

4     I'd like to request that we get the list of jurors.  Is

5     that Your Honor's practice?  It sounds like the day

6     before.

7                    THE COURT:  We do do that at noontime, I

8     believe --

9                    MR. DOW:  Got it.

10                   THE COURT:  -- you can get a copy of that.

11                   MR. DOW:  Will that have all 120 or just each

12    day?

13                   THE COURT:  I don't know for sure.

14                        (Pause.)

15                   THE COURT:  It looks like -- I'm just learning

16    from Ms. Barry that it will be a list of the people who

17    have been summoned in who we reasonably expect to come,

18    although there's oftentimes no-shows there.  So it will be

19    over-inclusive, but we will be happy to give you the list

20    that we have.

21                   MR. DOW:  Thank you.

22                   THE COURT:  All right.  I think for the two

23    motions that seem to be related to the jury selection are

24    Numbers 317, and that's the defendants' joint motion to

25    renew their request to exclude CMEEC member town residents

1    from the veneer.

2            Mr. Murphy.

3            MR. MURPHY:  Good morning, Your Honor.

4            Your Honor, we understand Your Honor has chosen

5    a different path on this.  That motion is made to preserve

6    the issue.  We remain concerned, for the reasons we said

7    previously, that the government is going to make the case

8    apparently that the rate payers are the victims of this

9    alleged crime, and our position is while that's wrong as a

10   factual matter, it obviously has implications if any rate

11   payers or people associated with them wind in the veneer.

12   So that's why we made the motion, Your Honor.

13           We added, as Your Honor probably noted, one

14   other problem appears to be at least one rate payer has

15   written Your Honor expressing concern about the issue of

16   CMEEC having to pay for fees in this case and feeling as

17   if they're a victim of that as well.  It's for that reason

18   that we have concerns that the veneer members in the first

19   place not include people from the towns served by

20   CMEEC-related utilities.

21           THE COURT:  I understand.  Okay.  Thank you.

22           MR. MURPHY:  Thank you, Your Honor.

23           THE COURT:  Government?

24           MR. McGARRY:  Briefly, Your Honor.  Mike McGarry

25   for the government, Your Honor.

1          Briefly directing you to your own opinion from

2     Document 261, page 3, the second full paragraph, I think

3     the Court addressed this issue.  I think if that

4     particular rate payer happens to show up in the jury pool,

5     that might be someone you might want to strike for cause.

6     But as far as just generally trashing our jury plan and

7     excluding all the people from all the towns, I think you

8     addressed it in your prior ruling that we don't

9     categorically exclude all the people from, you know, a

10    part of New Haven if there's a New Haven gun violence

11    case.  That's not how it works.  And that's why there are

12    peremptory challenges and that's why there are challenges

13    for cause.  I'm sure that the Court can handle that

14    throughout the rest of the week.  I think the renewed

15    motion should be again denied.

16          THE COURT:  Thank you.

17          So I'm going to deny the motion, Number 317, to

18    exclude all persons from CMEEC member towns from the

19    veneer for the reasons I previously stated in light of the

20    alternative protections that can be engaged in by means of

21    voir dire of individual persons who may be residents of

22    any of the member towns.

23          That gets us to the next jury-related motion,

24    which is Number 325.  It's the defendants' joint motion

25    in limine to award additional separate peremptory

1    challenges.  I think the proposal is to include 20 total

2    with allocation of four to each of the five defendants.

3              Mr. Murphy.

4              MR. MURPHY:  Yes, Your Honor.  That was the

5    request and it was for the obvious reason that the rule

6    contemplates that defendants are to have more peremptory

7    challenges than the government.  That same rule covers one

8    defendant, five defendants, ten defendants, and it seems

9    to us that the Court has discretion to increase the number

10   of peremptories, and that's what we're requesting in these

11   circumstances in a hotly contested case, including in

12   circumstances where we may very well have people who wind

13   up in the veneer who are not in some way, shape, or form

14   have some affiliation to CMEEC or people served by CMEEC

15   utilities.  For all those reasons, Judge, we would ask the

16   Court increase from ten the number of peremptory

17   challenges available to the defendants.

18             THE COURT:  This is a matter that's committed to

19   the Court's discretion as opposed to being mandatory.

20             MR. MURPHY:  That's my understanding,

21   Your Honor.

22             THE COURT:  Thank you.

23             Government?

24             MR. McGARRY:  Yes, Your Honor.

25             First of all, I think the Court need not decide

this morning.  I think there's an issue of media that was
brought up.  There's the issue of COVID which was also
brought up in the pretrial motions.  And one wonders how
many qualified jurors we're going to get.  So that would
be my first point is let's reserve today and see where we
are come end of Wednesday.

Secondly, I understand the argument.  I also
understand that the rule contemplates a certain
proportion.  So we think 20 is too high.  However, if the
Court, in its discretion, does decide to grant additional
peremptories at the end of the day Wednesday or Thursday
morning, then we would request a proportional increase for
the government which I think is also contemplated by the
rule.  I don't think it makes sense.  I don't think it's a
fair selection process to leave the government at six and
then increase the defendants to 20.  So I would suggest
that if the Court is so inclined, we did a little bit of
math in our brief.  I think it worked out, a couple of us
checked.  I won't try to do math on my feet.  I think we
suggest that.

And then finally, the defendants had suggested
that they want to exercise their strikes independently.  I
think the Court also has discretion on that.  Presumably
if they have 15, that is three per person.  Depending if
they want to coordinate, that's up to them.  And I point

1    out the interesting footnote that they wanted to have

2    independent strikes filed in a joint motion.  So clearly

3    they are coordinated to some extent on the jury selection

4    process, and I leave it to the Court and to the defendants

5    as to within your discretion if they want to do them

6    independently or if you want to have them do it -- you

7    know, it goes over there, the sheet goes over there, and

8    then comes back.

9              THE COURT:  Okay.  All right.

10             Mr. Murphy, anything else on this motion?

11             MR. MURPHY:  Your Honor, the only other thing I

12   would say as to that last point, the independence of the

13   choices are less important to us.  We're happy to work

14   them out jointly than it is that we have a greater number

15   under the circumstances.

16             THE COURT:  Thank you very much.  I'll hold the

17   motion under advisement for now.

18             MR. MURPHY:  Thank you.

19             THE COURT:  Okay.  I think that gets next, at

20   least on my -- I don't think that there are other motions

21   in limine that I need to be actively considering before

22   jury selection, is there?

23             So that gets me, I think, to the issue of

24   opening statements.  It looks to me that the prosecution

25   is suggesting that there not be an opening statement but

1    simply that the Court would read a statement.

2            MS. KARWAN:  Yes, Your Honor.  And that was

3    based on the belief that the defendants would not want

4    opening statements.  I understand they do.  It's the

5    government's position we're happy to do opening

6    statements.  The only concern is one of efficiency.  It

7    should be a very modest amount of time afforded to the

8    parties so we don't spend an entire day in opening

9    statements.  After the Court has instructed anything that

10   the attorneys say to you is not evidence, and then we

11   spend the bulk of the first day on opening statements, it

12   seems to be an inefficient way to proceed when we're

13   trying to move quickly in light of all circumstances.

14           THE COURT:  Okay.  Thank you.

15           MS. KARWAN:  We're thinking along the lines 20

16   minutes for the government, 10 minutes for each defendant,

17   something modest so we can keep things moving.

18           THE COURT:  I see.  Okay.

19           How does that sound to defense?

20           MR. RAABE:  I'll let Mr. Dow or Mr. Rosenthal

21   speak for their client.  The rest of the clients, 10

22   minutes would be acceptable.

23           THE COURT:  I see.

24           MR. ROSENTHAL:  Your Honor, in light of the

25   different defendants, the scope of this case, we think

1    something more than 10 minutes would be warranted.  Not

2    that every defendant would use more than 10 minutes.  I'm

3    not talking about an enormous amount of time, but

4    something in the range of --

5              THE COURT:  You would like more than 10 minutes

6    for Mr. DeMuzzio?

7              MR. ROSENTHAL:  Yes.

8              THE COURT:  All right.

9              I'm going to go ahead, then, and I think adopt

10   the majority view that it would be appropriate for the

11   government to give up to 20 minutes for an opening

12   statement and for each defendant to be allowed up to 10

13   minutes.

14             And are the defendants fine with deciding what

15   order to proceed?

16             MR. RAABE:  Yes, Your Honor.

17             THE COURT:  All right.  I would also ask if any

18   party wishes to use any visual materials for purposes of

19   your opening, that you clear that first with the other

20   parties as well so that I can entertain any objection if

21   there will be an objection to the use of any kind of

22   visual exhibits during an opening statement.

23             All right.  I think that gets us to the various

24   motions in limine unless there's anything else we need to

25   cover.  All right.

1          So I'm not sure if there's another way to

2    proceed.  I think I'll just go in numerical order.  I know

3    some of them are a little bit intertwined.

4          I'll start with the first motion in limine, it's

5    Number 310, it's the defendants' joint motion in limine

6    for a reconsideration concerning Connecticut law.

7          Mr. Murphy.

8          MR. MURPHY:  Yes, Your Honor.  Thank you.

9          So, Your Honor, as we pointed out in our papers,

10   Connecticut state law is interwoven through this case.  As

11   you know, the indictment in Paragraph 1 makes clear that

12   CMEEC was created under the laws of the state of

13   Connecticut and, as Your Honor may or may not know at this

14   point, the government's first proposed exhibit in this

15   case is the first subsection of the enabling act of CMEEC

16   which has the purpose provision in it.

17         THE COURT:  Okay.

18         MR. MURPHY:  We have no objection to that being

19   available to be used in evidence, Your Honor, but we don't

20   think it is the only part of the statute that should be

21   available and used.

22         And because of the allegations in the case, we

23   think a number of other provisions of the statute need to

24   be used.  One of them, as Your Honor said, is an

25   interrelated motion.  It is the members motion.  We think

1       that, in the first instance, should be decided as a legal

2       issue which we'll come to in turn.  But in the event it's

3       not and the government is allowed to put on evidence that

4       the towns are the members, we will, of course, want to put

5       on the evidence to the contrary.  And so that provision

6       should be in there.

7              As Your Honor knows, obviously it is also an

8       issue about ownership in this case and whether CMEEC could

9       have ever owned the monies in question.  The government

10      maintains that the monies always belonged to what they

11      describe as the member towns.  Our position is CMEEC owned

12      monies that were used here.  In addition to that, as a

13      result of that, we need to be able to prove the provisions

14      of the statute that CMEEC in fact had the power to

15      contract, that CMEEC had the power to acquire, use, and

16      dispose of its income, revenues, funds, and monies.  And

17      the same to acquire, use, dispose of personal property,

18      that provision.

19             And then, Your Honor, as well, as you know, much

20      of that motion was taken up with a request to Your Honor

21      to reconsider what you originally viewed as a limitation

22      on the general power that is at the end of the powers

23      provision.

24             THE COURT:  Right.

25             MR. MURPHY:  That one, in particular, matters to

1    the defense because the defendants, there will be evidence

2    in this case that defendants understood that the purpose

3    of this organization was in part created to behave in a

4    more entrepreneurial fashion and that it could do the

5    kinds of things that private corporations did.  And that

6    that is not limited, for the reasons we indicated in the

7    argument, as we view it.  So that is the essence of that

8    argument, Your Honor.

9            We also ask and believe that it's relevant, if

10   we need to get into it, that there was an amendment after

11   all of this became public in 2017 to speak about how

12   strategic retreats could be conducted in the future.  We

13   think that's relevant because the manner in which it

14   passed and what it says, the way it says it, because it's

15   not added as a new power, suggests that that power always

16   was there, it's just now made express and includes certain

17   limitations as a result of the public outcry about this.

18           THE COURT:  All right.  So I guess I understood

19   the motion as really asking for multiple things which was,

20   number one is you'd like to include -- have testimony and

21   perhaps even a copy of the various enabling statutory

22   provisions beyond just the purpose provision.

23           MR. MURPHY:  That's correct.

24           THE COURT:  But especially for -- I think you'd

25   want Section 7-233c, which goes to the membership issues

1   and board representatives.  And then -- but tell me if I'm

2   mistaken about this.

3             MR. MURPHY:  The members issue, Your Honor, if I

4   wrote it down correctly, is 7-233b(6).

5             THE COURT:  B(6), okay.

6             MR. MURPHY:  Then there are other provisions in

7   c, Your Honor, that talk relevantly about who the members

8   are.  And then the powers provision is in 233e.

9             THE COURT:  Right.

10            And then the 2017 amendment is in, I think,

11  233b(j).

12            MR. MURPHY:  That's correct, Your Honor.

13            THE COURT:  So basically, as I understand it, do

14  you know exactly which provisions you want to include?  Do

15  you want to just include the full legal provisions here or

16  do you have a subset?

17            MR. MURPHY:  We're comfortable doing it either

18  way, Your Honor.  I think we'd be happy having the full

19  statutory provision in.

20            THE COURT:  I see.  Okay.

21            And then beyond that, I think what -- it seemed

22  to me the concern that you have is that the Court's prior

23  ruling at the dismissal of the indictment stage could be

24  read as suggesting that no form of corporate retreat or no

25  form of corporate social function is permissible in light

1    of the limited purposes of the -- that the statute says or

2    the Court's interpretation of what those limited purposes

3    are?

4              MR. MURPHY:  I think, Your Honor, our concern is

5    a little broader than that.  It is that Your Honor read

6    that final powers provision which we believe independently

7    begins at the generally point to be limited by the

8    transmission and generation of electric power --

9              THE COURT:  Right.

10             MR. MURPHY:  -- provision.  And our position is

11   that those relate to separate things.

12             THE COURT:  Yes, I saw that.  And you also point

13   to the broader language of actually the purpose section,

14   which the government is putting in anyways.

15             MR. MURPHY:  Correct.

16             THE COURT:  All right.

17             And then the 2017 amendment, your point there

18   is -- and I know you rely on law that suggests that the

19   Connecticut law that suggests that the fact of a later

20   amendment can be taken as an understanding of what the

21   statute meant at the time.

22             MR. MURPHY:  Yes, Your Honor.  Under the rule of

23   statutory interpretation, that if something is done soon

24   after the original act is contested, that it's an

25   interpretation of the original act.  Our view is, given

1      that the contest of the original act for the first time

2      came up after these retreats became public, that the

3      legislature's response by putting in that provision about

4      strategic retreats is something that is relevant because

5      it tends to make the propriety of the retreats and the

6      defendants' good faith more probable than without it.

7              THE COURT:  So the statutory provision, it stops

8      short of saying -- you're trying to imply that from the

9      fact that the legislature enacted a 2017 --

10             MR. MURPHY:  We're not saying the statute says

11     that in so many words, Your Honor.  But you are correct,

12     we would argue that that's what it means.

13             THE COURT:  And so I take it, then, there would

14     be an equal argument that to the extent that it imposes

15     additional, say, geographical limitations, that those were

16     also equally implicit in the prior interpretation or

17     understanding of the law.

18             MR. MURPHY:  Certainly not from us, Your Honor.

19     If it comes into evidence, one could imagine that the

20     government might argue that that's true.  But there is

21     nothing in the statute to suggest that until --

22             THE COURT:  So you would not object, then, if

23     you put that provision in, the government will be free to

24     say, well, the Court has instructed you that this

25     statutory provision is the legislature's authoritative

1    interpretation of what its law means, and then the

2    government could argue that clearly on its face going to

3    West Virginia or to Kentucky violates this statute and

4    it's a citation of the law.

5         MR. MURPHY:  Your Honor, maybe I'm not following

6    you correctly.  If the Court is talking about instructing

7    the jury that the interpretation works to have meant as a

8    limitation back at the time, then we would obviously

9    oppose that.  Because --

10        THE COURT:  But I thought that was your whole

11   grounds for suggesting that the statutory provision was

12   what was admissible.  Of course the ordinary rule of

13   statutory interpretation is that the later statute that's

14   after the dates in question do not apply retroactively.

15   So I thought that the whole reason why you're saying this

16   provision matters is because the legislature under this

17   particular principle, Connecticut-specific principle of

18   statutory interpretation, when it legislates after some

19   kind of controversy -- we should talk about that, exactly

20   what's going to come in in terms of the controversy -- it

21   is basically saying what the law was, what it meant.  It's

22   an authoritative interpretation by the legislature what it

23   meant as of an earlier date.  And so I just -- I think

24   there's just a goose and gander issue here.  It looks to

25   me like you're going to try to say what it means is that

1    these kinds of -- as the statutory provisions as a

2    strategic retreat or particular activity, that's the

3    provision of (j), you want to take basically the first

4    sentence and seize upon that and say that means that the

5    legislature understood from the get-go that that's lawful.

6    It seems to me that the government should then have equal

7    license to argue that the legislature always understood

8    that similar additional restrictions there, mostly the

9    geographic one, and the additional procedures that I don't

10   think you're going to suggest were met here that the

11   statute requires were met.  That raises a concern, I

12   guess, in terms of what exactly really you want here.

13            MR. MURPHY:  Understood, Your Honor.

14            And I think what I'd say is if that's the road

15   we're going down, then more likely than not we will not

16   offer that provision of the amendment because I don't

17   think that that is a fair reading of what happened here.

18            THE COURT:  I'm not going to rule on this or

19   basically any of the remaining motions in limine today.  I

20   want to hear arguments before I rule, but I think I want

21   to hear from the government on this as well, but I'd like

22   to hear more about that, because that just seems to me to

23   be a very obvious concern here in terms of putting this

24   provision in.  I don't know how I could limit the

25   government to making the argument I just said and I don't

1    know what's going to go on in terms of, to the extent that

2    the provision is -- or the relevance of the provision, by

3    your own terms or by your own argument, is simply because

4    there was a controversy about the matter, what evidence is

5    going to be coming in that this was enacted specifically

6    because of this controversy.  I just don't know.

7              MR. MURPHY:  I understand Your Honor's concern.

8    Perhaps if we could later today we could follow up and

9    file something with the Court about this?

10             THE COURT:  That would be great.  That would be

11   great.

12             Let me hear from the government.

13             MS. KARWAN:  Your Honor, the government doesn't

14   have any concerns with the broader provisions of the

15   statute coming in and wasn't exactly sure what was being

16   proposed with respect to the defendants' motion in that

17   regard.  And obviously is not seeking to limit any offer

18   of what the defendants' good faith was subjectively in

19   their heads at the time.

20             The one concern is, and I think we flagged this

21   in terms of the expert motion, is that the jury can

22   understand these provisions and they can understand the

23   arguments provisions, that the defendants are not looking

24   for some instruction either by the Court or through expert

25   testimony as this is what state law means here or allowed

1    or anticipated.  The provisions can come in and people can

2    argue from their terms.  But that we're not opening the

3    door to an expert coming in to opine this is what state

4    law meant.

5               THE COURT:  I see.

6               So the government does not object to the

7    enabling provisions from I think 233a and forward being

8    used by the parties?

9               MS. KARWAN:  No, Your Honor.

10              Obviously, the 2017 amendment is a concern

11   because I think it could be fairly interpreted that the

12   legislature was specifically seeking to make explicit that

13   the conduct in question here was not permissible and was

14   simply codifying that in the law.

15              I think, Your Honor, just from what the

16   government has seen, the 2017 amendment was the product of

17   significant debate and negotiation at the Capitol.  One of

18   the proposals on the table at the time was to get rid of

19   CMEEC in its entirety because of the fallout from these

20   trips.  So to offer it in the sense that it necessarily

21   means one thing I think is a slippery slope in terms of

22   really what the legislature had in mind.  But the

23   government --

24              THE COURT:  Well, the legislature, what they had

25   in mind is what they enacted, right?

1           MS. KARWAN:  Yes.

2           THE COURT:  I wouldn't expect anybody to go into

3    the whole debate that occurred.

4           But are you saying that -- are you opposing this

5    provision coming in?

6           MS. KARWAN:  We are, Your Honor, yes.  I think

7    because it doesn't speak for itself.  And it would be

8    subject to what the parties are suggesting the

9    interpretation should be of it.

10          THE COURT:  Are you reserving the right, then,

11   to argue that if the provision did come in, in fact the

12   government would be free to argue that this just proves

13   the government's point that it was a violation of law?

14          MS. KARWAN:  Yes, Your Honor.

15          THE COURT:  Okay.

16          More generally, I'm going to ask the government

17   to file an opposition or objection to the defendants'

18   motion for reconsideration in terms of the Court's

19   interpretation of the powers provision there in its ruling

20   on the indictment dismissal.  My view, there's substantial

21   questions raised by the defendants' motion in terms of --

22   basically in terms of to the extent that the Court's

23   ruling might be interpreted as suggesting that

24   categorically this kind of company, CMEEC, is not allowed

25   to do strategic retreats, not allowed to even go to a

1    Yard Goats game that we talked about.  I'd like more

2    guidance on that.  It seems like it's an important

3    threshold issue in the case.

4              MS. KARWAN:  We're happy to do that, Your Honor.

5              THE COURT:  I'm not sure if, to the extent my

6    prior ruling is read that way or if I wrote it that way,

7    I'm not sure -- I have questions about whether my

8    restrictive reading of the statute is --

9              MS. KARWAN:  We hadn't understood it that way,

10   but we will follow up.

11             THE COURT:  And I know I ruled in the

12   alternative.  My dismissal ruling was not dependent on

13   that because I relied on alternative grounds as well, but

14   I did talk about the statute, and I think I'd like to know

15   more about that.  It's going to be important for the scope

16   of evidence as well as jury instructions in the case.

17   Would you be able to file a reply by Thursday, if

18   possible, end of Thursday?

19             MS. KARWAN:  Yes, absolutely.

20             Your Honor, to be clear, it's not the

21   government's position these were legitimate corporate

22   retreats but state law prohibited you from taking these.

23   The government's position is these were personal endeavors

24   and not appropriate.

25             THE COURT:  That's what I thought, I guess.  My

1    sense was I don't know that you were saying or that your

2    position is that any form of corporate retreat, in terms

3    of some off, out-of-building experience that's somewhat

4    social in nature, is illegal under state law.  Is that

5    your position?

6                MS. KARWAN:  Yes, Your Honor.  In fact, I think

7    there will be evidence of other corporate retreats taken

8    by CMEEC during the relevant time period.

9                THE COURT:  So are you saying that those are all

10   illegal?

11               MS. KARWAN:  No, Your Honor.

12               THE COURT:  All right.  Or unlawful?

13               MS. KARWAN:  No.  That there were actual other

14   trips and activities billed as corporate retreats or team

15   building.  The government is not going to argue that those

16   were unlawful.

17               THE COURT:  I see.  So the focus is on these

18   particular ones being the subject of the indictment.

19               MS. KARWAN:  Yes, Your Honor.  And obviously the

20   billed compensation committee trip in August of 2015 is --

21   was not billed as a board retreat but was instead a

22   subcommittee, if you will.

23               THE COURT:  Okay.  Thank you.

24               So I'll hold that under advisement, that motion,

25   and look forward to the government's further response

1    there.

2              I think that gets us to our next motion which is

3    the government's motion to preclude aspects of the

4    defendants' proposed expert testimony.  I know there's

5    three experts at issue there.

6              I think my initial reaction to the motion was

7    it's a complicated motion.  It requires a closer look at

8    the expected testimony of the three experts and multiple

9    aspects of it.  I won't sure that I needed to resolve the

10   motion now before we start trial evidence in the case

11   because the defendants' experts would testify during the

12   defense case which would be at least two weeks into the

13   trial.  And my thought was I might be better informed if

14   I've heard the government's evidence in the case and to

15   the extent the testimony might vary in some ways based

16   upon what comes in during the government's case.  But I'd

17   like to hear from counsel if they think this is something

18   that I need to essentially front burner in terms of

19   deciding.

20             MS. LEVENS:  Good morning, Your Honor.  Tara

21   Levens for the United States.

22             The government agrees with that approach,

23   Your Honor.  I think part of the difficulty in responding

24   to the motion was a lack of clarity about what precisely

25   the experts were going to be testifying about.  To the

1    extent that position is fleshed out during the course of

2    trial, presentation of evidence, as well as through

3    additional disclosures from the defense about what exactly

4    those experts will be testifying about, that would be

5    useful both to the government in responding to the proffer

6    of evidence as well as to the Court in ruling on it.

7              THE COURT:  Mr. Healy.

8              MR. HEALY:  I think I can speak on behalf of the

9    defendants, that approach is acceptable to us.

10             THE COURT:  So we'll bracket that motion and

11   we'll come back to it as the trial evidence comes in.

12             To the extent that the defense comes up, if they

13   decide to, if they wish to modify the proposed

14   descriptions and contours of the testimony and to discuss

15   that with counsel in advance, that would be helpful, of

16   course, to moving along resolution of the motion.

17             I think the next motion is 312, it's the

18   defendants' joint motion in limine to preclude evidence

19   related to CMEEC members.  Who would like to be heard on

20   that?

21             Mr. Murphy.

22             MR. MURPHY:  Thank you, Your Honor.

23             Your Honor, I think this is one of several

24   motions that obviously we've heard aspects of before, but

25   done at the time in the context of the indictment and its

1    allegations, at motions to dismiss.  At this point,

2    Your Honor, we think, as Your Honor is the gatekeeper

3    obviously of what gets to the jury, to consider whether

4    the member evidence that the government proposes to use is

5    accurate.

6          And Your Honor, one thing that is indisputable

7    about this discussion is that the enabling legislation, as

8    we were just talking about at Section 7-233b(6), defines

9    the members of an organization like CMEEC as the municipal

10   electric utilities.  And Your Honor will note that the

11   government's response does not even mention that fact.

12   The government mostly talks about other aspects of the

13   statute and subordinate governance documents like the

14   membership agreement.

15         Your Honor may recall the exchange back at the

16   time of the motions to dismiss where Your Honor asked

17   whether any such subordinate document would trump the

18   statute, and the answer from the government was, of

19   course, no, it can't.  And that's our point, Your Honor.

20   The statute governs here.  The statute says who the

21   members are.  The statute says the members of the

22   municipal electric utilities.  We don't dispute that the

23   municipalities have certain approval or disapproval

24   functions under the statute.  We don't dispute that these

25   utilities are departments of the municipalities.  But what

1    they also are, Your Honor, for purposes of Section 666, is

2    they are government agencies, stand-alone government

3    agencies.  That's alleged in the indictment in

4    Paragraph 3.

5            THE COURT:  So if a utility is simply a

6    department of a municipality, what's the significance of

7    that?

8            MR. MURPHY:  Well, the significance for these

9    purposes, Your Honor, I think, is that it meets the

10   definition of 666(d)(2) as a government agency.  It could

11   have been the thing that was indicted as a result of that.

12           THE COURT:  So say you have a corruption case or

13   a 666 case in which, oh, I don't know, the police chief

14   has stolen money from the police department.  And if the

15   government alleges that the police chief stole money from

16   the municipality at issue, would that fail then because in

17   fact the police chief stole the money from the police

18   department?

19           MR. MURPHY:  Depending on how it was indicted,

20   Your Honor, it would have the same problem we have here.

21   I don't think there's any --

22           THE COURT:  Why would that fail?  In terms of

23   the purpose of the indictment which is to serve notice of

24   what happened in terms of the overlap between the

25   entities, the fact that the municipal utility does not

 1    exist apart -- it doesn't exist but for the fact that

 2    there is a municipality in the first place.  I just wasn't

 3    clear why that would follow.

 4         MR. MURPHY:  Your Honor, so I believe that most

 5    of these utilities are created by special acts of the

 6    Connecticut legislature.  And so as a consequence, they do

 7    exist independently.  What's important, I think

 8    particularly here, is they do exist independently for

 9    purposes of Section 666 as government agencies.  And that

10    fact would allow them to be instead of the member towns --

11    and by the way, the supposed shorthand that the government

12    describes is not what the indictment says.  What the

13    indictment says in no uncertain terms in its second

14    sentence is CMEEC are six identified municipalities.  So

15    there's no reference in the indictment to the shorthand

16    that the government mentions now.

17         THE COURT:  Doesn't the indictment refer to the

18    municipalities acting through their municipal --

19         MR. MURPHY:  There is one reference to that,

20    Your Honor.  But the rest of the indictment refers to the

21    six towns or cities as the member towns.  And so our

22    position is that's simply inaccurate.  The members are the

23    utilities.  That is a fact.  In fact, what Your Honor will

24    hear throughout the trial is that the people who were

25    having all of the dealings in this process are people

1   connected to the utilities.  The utilities have their own

2   governing bodies.  For instance, Norwich Public Utilities

3   is governed by the Norwich Board of Public Utility

4   Commissioners.  That's separate from the body that governs

5   the City.  The point we make about Bozrah, the statement

6   in the government's response that Bozrah became a member

7   of CMEEC is not true.  Bozrah Light and Power Company

8   became a member of CMEEC in 2016.  And if Your Honor would

9   like, I can hand up the application for membership to show

10  that.  It's approved by various bodies, including those

11  affiliated with Groton, because Groton Public Utilities

12  owns Bozrah Light and Power, not Bozrah.

13          So the indictment is wrong in that very real

14  sense.  And so to try to tie Bozrah Light and Power to

15  Bozrah as the municipality doesn't work.  And it's because

16  it's the utilities that are the members, not the towns.

17          And so our position, Your Honor, is that the

18  government has the members described wrong and that the

19  elements are missing.  There is not an allegation of

20  $10,000 with respect to the utilities.  There's no agents

21  allegation with respect to the utilities.  And there is an

22  ownership allegation with respect to the utilities.  That

23  part of the case shouldn't be in the case.  To allow the

24  member towns allegations to go to the jury is to allow

25  inaccuracy to be told as the story here.

1             THE COURT:  I see.

2             So then on the police department hypothetical I

3   just posed, if the police chief of New Haven were to take

4   money from the police department, the government could not

5   simply charge it as taking money from the City of

6   New Haven, would have to charge it as money from the

7   department?

8             MR. MURPHY:  Your Honor, if the police

9   department in that hypothetical satisfies the definition

10  of 666(d)(2) as a government agency, then yes, that's the

11  way it should be charged.

12            THE COURT:  The government has to narrow it down

13  to the sort of least common or the smallest unit that

14  constitutes a legal agency?

15            MR. MURPHY:  I'm not suggesting that that always

16  has to happen, Your Honor.  But what also has to be

17  factored in here is that there is a misdescription of the

18  members.  The member towns are not the members.  There's

19  no getting away from that.  In Your Honor's hypothetical,

20  if the hypothetical indictment misdescribes the police

21  department somehow, then we might have a parallel

22  situation.  But it's not just that they chose a different

23  agency.  It's that they chose a body that isn't the

24  member, and the member could have been the agency by law,

25  and they didn't elect to indict that.

1            THE COURT:  I got the argument.

2            Government?

3            MR. McGARRY:  I'll try to be brief, Your Honor,

4    because I know there are about 30 of these.

5            I think the government's position, which we put

6    in our motion, incorporate all that, is what the Court was

7    saying that the member utilities do not exist but for the

8    municipalities and that the municipalities are acting

9    through the member utilities, as we say.

10           Also, I'll point out, and I'm sure the Court is

11   well aware at this point, the membership agreement, for

12   instance, is signed by Mr. Bilda on behalf of the City of

13   Norwich.  And that will be in evidence at trial.

14           And I think, you know, I just point out the

15   towns created the member utility much like the police

16   department.  And I think to take Mr. Murphy's hypothetical

17   would be that the New Haven Police Department can act

18   independently.  And if they decide, well, today, you know,

19   we'd like to go to Bridgeport to kind of be the police

20   department of Bridgeport because we're independent and

21   we're going to break free of New Haven and do our own

22   thing, and then next week we'll be up in Enfield.  That

23   obviously doesn't make any sense.  I think here in the

24   same way the municipalities are represented by the

25   municipal electric utilities and that there's no daylight

1    in between the two.

2            I believe, you know, I direct the Court again in

3    our brief I think it's page 14, footnote 9.  I won't try

4    to repeat the discussion of Bozrah.  I think it's laid out

5    there for the Court.  And I think also footnote 10 is,

6    again, that's on page 14 and 15.  Since the Court already

7    decided that you're going to reserve, I'm not going to

8    bother to read it into the record, but I would direct you

9    to those.

10           And I just point out that the town approves the

11   contracts and the MEUs act as representatives of the towns

12   and the towns have control over the MEUs.

13           THE COURT:  If I look at the -- if we look at

14   the enabling legislation, and I have a copy here of

15   7-233c, I don't know if you have that handy or accessible

16   at all.

17           MR. McGARRY:  I'll try to get it, Your Honor.

18           Okay.

19           THE COURT:  So it's obviously a fairly detailed

20   provision.  But it looked to me, for example, in

21   sub-part (b) of 7-233c, it looks like the statute seems to

22   contemplate some difference between the MEUs, or the

23   utilities, and the municipality.  For example,

24   sub-part (b) I think describes the process by which

25   another municipal electric utility may become a member of

1    a cooperative.  It says that the MEU must file with the

2    cooperative a resolution duly adopted by its governing

3    body requesting membership in such cooperative and, goes

4    to sub-part (b), a certified copy of the proper

5    proceedings duly adopted by the municipality represented

6    by the municipal electric utility consenting and agreeing

7    to such membership.

8              This is just an example.  But I guess I wonder

9    if the statute contemplates actions that are separate by

10   the utility as distinct from the municipality, does that

11   suggest that there should also be a similar distinction

12   drawn here?

13             MR. McGARRY:  I think I would say no,

14   Your Honor.  I couldn't follow where you were reading

15   from, and I apologize.

16             THE COURT:  Well, do you have sub-part (b) there

17   of the statute?

18             MR. McGARRY:  I do.

19             THE COURT:  It basically describes -- and I'll

20   put it at least as I understand it -- it describes the

21   ways in which a utility can become a member of a

22   cooperative.  I take it you don't even dispute that under

23   the law, as distinct from the membership agreement, but

24   under the statute it's a utility that's the member,

25   municipal electric utility that's identified as being a

1   member.

2             MR. McGARRY:  I think the utility as a

3   representative of the member towns goes into CMEEC, but

4   it's not the utilities divorced from or independent from

5   the member towns.  Like if it's a Venn diagram, they're

6   within the other.  It's not separate and apart, it's this

7   inside of that, like the Department of Recreation,

8   Department of Public Works, Police Department, as you

9   mentioned.  We don't want Department of Recreation, Parks

10  and Rec. showing up to CMEEC, right?  We don't want the

11  police chief saying, hi, I'm the representative this week.

12  You've got your MEU that's created within the town and

13  then you're going to go -- in essence, go to CMEEC.  So

14  you have presumably, and I don't think it's in the

15  statute, but presumably some specialized knowledge,

16  information.  You're the MEU.  Don't just send us the

17  mayor.  Send us somebody who is going to deal with the

18  issues --

19            THE COURT:  I guess I'm pointing to this

20  particular provision which seems to contemplate specific

21  action, it's sub-part (A), capital A, in subsection lower

22  case (b).

23            MR. McGARRY:  Is that where you say "a

24  resolution duly adopted by its governing body, requesting

25  membership in such cooperative, and (B) a certified copy

1    of the proper proceedings" -- is that what you're

2    referring to, Your Honor?

3              THE COURT:  Yes, I am.

4              MR. McGARRY:  -- "duly adopted by the

5    municipality, represented by the municipal electric

6    utility."

7              So it's got to be adopted by the municipality

8    and they're represented by the MEU and the town approves

9    the application to join the coop, I believe that's under

10   Section 7-233a that the town approves of the contracts and

11   has veto power, I think that's under 7-233x, the town

12   approves withdrawal from the coop, and that's under

13   7-233c(c), and the town has control over what the MEU does

14   vis-à-vis the coop.

15             THE COURT:  The town is very involved, clearly.

16   But I understood defendants' point to be they're separate.

17   That the town is not the same -- under their

18   interpretation, the town is not the same as the utility.

19   And that's what I'm struggling with a little bit.

20             MR. McGARRY:  I don't think you need to

21   struggle, Your Honor.  I go back to the membership

22   agreement which -- and this particular copy is signed

23   March 27, 2013, and Mr. Bilda signs on behalf of the City

24   of Norwich.  He does not sign on behalf of a separate

25   utility entity.  Nor does he sign on behalf of both, like

1    today appearing for the City of Norwich and.  He appears

2    in the membership agreement as does everybody else.  You

3    know, City of Groton, Borough of Jewett City, Second

4    Taxing District, Third Taxing District.  So to the extent

5    that they are separate entities, the MEU -- and I'm

6    repeating myself and I apologize, but the MEU is subsumed

7    within the member town.

8              Again, I direct you to our thoughtful pleadings

9    which I think we put a lot of time, even down to the

10   footnotes, to try to give the Court our position.

11             THE COURT:  Understood.

12             I take it is your argument in part that the

13   defendants' argument at this time about this issue at the

14   least would not warrant a pretrial dismissal of the

15   charges here or a limitation on evidence?

16             MR. McGARRY:  Certainly, yes.

17             THE COURT:  That the Court should at the least

18   hear or the evidence should be considered in the case?

19             MR. McGARRY:  I think that's right, Your Honor.

20             I think it's also -- and I'm not surprised where

21   the Court is going because, as usual, you're a few steps

22   ahead of me -- but I think it's one of the elements of the

23   offense that we would have to establish.  Might be the

24   second one.  So one is not going to preclude the

25   government from in a well, you know, pled indictment, from

1    proving the elements of the crime pretrial.

2              THE COURT:  Thank you.

3              Mr. Murphy, do you have anything else to add on

4    this motion?

5              MR. MURPHY:  Yes, Your Honor.  Thank you.

6              Your Honor, Your Honor's position is correct as

7    a matter of fact and as a matter of law, that the

8    utilities are separate and separately governed by the

9    municipalities in question.  Your Honor, this gets us back

10   to the Connecticut law phenomenon a little bit, because

11   the reason that's the case -- and the Court would hear

12   about this at trial -- is that there are liability

13   concerns, right?  The municipalities operate the kind of

14   thing and are responsible for the kinds of debt

15   obligations that no municipality wants to saddle itself

16   with, so it makes itself separate.  So that is a very real

17   phenomenon.

18             If Your Honor takes a look at, if you have the

19   enabling statute there --

20             THE COURT:  I do.  Yes.

21             MR. MURPHY:  7-233b(6), as Your Honor knows, is

22   the definition of member.

23             THE COURT:  Hold on just a moment.  Let me grab

24   that.

25             MR. MURPHY:  Yes, Your Honor.

1            THE COURT:  Okay, I've got it.

2            MR. MURPHY:  As Your Honor will see, it says

3   "'Member' means any municipal electric utility within the

4   state which has been in continuous operation for at least

5   five years and whose governing body authorizes membership

6   in, and which becomes a member of, a municipal electric

7   cooperative."

8            "Governing body," Your Honor will see is defined

9   directly above that section.  And "'Governing body' means

10  the board of commissioners of a municipal electric

11  utility."

12           That's who decides whether it becomes a member.

13  Yes, it has to be approved ultimately by the municipality

14  or not disapproved, I suppose.  But it is the governing

15  body of the utility that decides.

16           And if I may, Your Honor, hand up the paperwork

17  I was talking about about Bozrah.

18           THE COURT:  That's fine, sure.

19           Does the government have a copy of this?

20           MR. MURPHY:  I'm about to give them a copy,

21  Your Honor.

22           Your Honor, what you'll see as you go through

23  this series of documents is the first page is an

24  application in October of 2015 for the Bozrah Light and

25  Power Company to become a member.  And as you read through

1    the various resolutions to allow that, it is the Bozrah

2    Utilities Commission who is authorizing it, the Bozrah

3    Board of Directors is authorizing it, as is resolution of

4    the Mayor and the Council.  I will represent to Your Honor

5    that all of the officials making these resolutions are

6    from Groton.

7            So it is the case that what these demonstrate,

8    and there's more information after this about how CMEEC

9    then considers the application, but the point is BL&P, not

10   Bozrah, becomes the member.  That's the way it works every

11   time someone wants to be a new member, you have to be a

12   municipal electric utility and the provision Your Honor

13   just read to the government applies.  That's what this --

14   that process was followed here.

15           The only other thing I would add, Your Honor,

16   the government continues to refer to the membership

17   agreement which can't trump the statute on this point.

18   But even within the membership agreement, if you look at

19   the first whereas clause, it says "Whereas, each Party is

20   an MEU," municipal electric utility, "organized under

21   Chapter 101 of Title VII of the General Statutes of ...

22   the State of Connecticut."  So the membership agreement

23   recognizes the MEUs.

24           So Your Honor, we do think there is prejudice if

25   this is allowed to go to the jury at this point.  It's

```
 1    inaccurate.  It's wrong.  And it's not like this is news
 2    to the government.  This was raised at the time of the
 3    motion to dismiss that it's the utilities that are the
 4    members, not the towns.
 5              THE COURT:  I see.
 6              MR. MURPHY:  Thank you.
 7              MR. McGARRY:  Just briefly, Your Honor, because
 8    I know we've got a lot of these.
 9              I think Mr. Murphy read you (5) and (6), but
10    didn't read Section (8), which you probably read this
11    weekend, of 7-233b definitions.  "'Municipal electric
12    utility' means an electric department, agency or other
13    body of a municipality."
14              Which if Bozrah Power and Light, it couldn't
15    just join -- when it was a private entity it couldn't just
16    call up and say, hey, I'd like to join CMEEC, I'm Bozrah
17    Power and Light, a private company, can I just join in
18    with you guys?  They couldn't.  So that's why the Town had
19    to enact documents, legislation to join as the Town with
20    Bozrah Power and Light as the MEU.  So you can't take the
21    first part of the statute without continuing through.
22              THE COURT:  So is the government's evidence
23    going to include documents that are basically enabling
24    documents for the particular utilities at issue in the
25    case?
```

1            MR. McGARRY:  I'm sorry, I missed -- enabling

2    documents for --

3            THE COURT:  For the various members of CMEEC.

4            Does the government evidence -- I haven't gone

5    through page by page your evidence, but is it going to

6    include essentially the membership documentation that

7    shows for each of the members of CMEEC the municipal

8    utility and its structure and function?  Because if I look

9    at 7-233b(8), it defines, as you're directing me to look

10   at, you're saying it means an electric department, but of

11   course it goes on then and says "agency or other body of a

12   municipality."  So I just don't know if the government's

13   trial evidence, to the extent you're asking me and saying

14   I should defer resolution of this issue for trial, will it

15   include --

16           MR. McGARRY:  May I just have a minute,

17   Your Honor?

18           THE COURT:  Yes, go ahead.

19               (Pause.)

20           MR. McGARRY:  I know, even without consulting

21   with Ms. Karwan, I know that we are going to offer

22   witnesses to testify about their membership.  I think as

23   far as whether or not we're offering the town charter to

24   show how the MEU is part of the town, I don't know if

25   they're specifically marked.  I know we were trying to cut

1   evidence rather than add evidence.  But we can.

2           THE COURT:  The answer is you don't know about

3   that right now.

4           MR. McGARRY:  I don't know if that's stickered

5   as a potential exhibit.  If that's something that would be

6   helpful to the jury and helpful to the Court, we certainly

7   can add those enabling documents.

8           THE COURT:  I don't control what the government

9   puts in, but I'm just wondering if it includes it.

10          MR. McGARRY:  As I'm standing here now, the

11  answer is becoming probably yes, Your Honor.  We'll find

12  them, sticker them, and put them on the exhibit list.

13          THE COURT:  Okay.  All right.

14          Anything else on this motion?

15          MR. MURPHY:  Your Honor, just to be very clear,

16  the Town of Groton, the City of Groton did not join CMEEC

17  two times, right?  Bozrah Light and Power Company owned by

18  Groton Public Utilities run by Groton Public Utilities

19  joins as the Bozrah Light and Power Company.  The

20  indictment doesn't correctly identify the members.  And

21  the jury shouldn't hear evidence about inaccurate

22  information.  And we will be prejudiced if that's allowed.

23          THE COURT:  Okay.

24          MR. MURPHY:  Thank you.

25          THE COURT:  Thank you.

1          Let me turn to the next motion, which is

2    Number 313.  It concerns the defendants' joint motion in

3    limine to preclude evidence or argument that the

4    defendants intentionally misapplied funds in violation of

5    Section 666.  Who would like to be heard on that?

6          You're up again, Mr. Murphy.

7          MR. MURPHY:  Me again, Your Honor, sorry.

8          Your Honor, as you know, I'm sure United States

9    against *Urlacher* clearly identifies a distinction between

10   the first four ways in which someone can violate

11   666(a)(1)(A) and the fifth way, intentional

12   misapplication.

13         What the Second Circuit held in that case is

14   that the first four prohibitions -- embezzle, steal,

15   defraud, knowingly convert -- cover any possible taking of

16   money for one's own use or benefit.  And then the court

17   goes on to say to avoid redundancy, it must mean that

18   intentional misapplication is for use for otherwise

19   legitimate purposes.

20         And our point, Your Honor, is that here it is

21   clear that what is charged in this indictment is the

22   defendants took money for their own use and benefit, what

23   falls within the first four prongs of the determination by

24   *Urlacher*.

25         Paragraph 19 of the indictment alleges that the

1   trips "did not relate to CMEEC business, CMEEC member

2   business, and the furnishing of efficient low cost and

3   reliable electric power to the member towns and their rate

4   payers."  So the indictment makes clear that the

5   allegation is that this did not relate to CMEEC business,

6   and then goes on to make the allegation that the intent of

7   these trips was for the personal benefit of the

8   defendants, their family, friends and associates.

9           So, Your Honor, what the government, as we

10  understand it, is now arguing, and we heard a little bit

11  of this earlier, is that the government doesn't have to

12  prove that there was no corporate value or corporate

13  purpose to these trips, that they were purely personal.

14  Our position is that that is what they have to prove.

15  That is what has been indicted.  And frankly, Your Honor,

16  the government's response is of two minds on this.

17  Earlier in response to one of our other motions, the board

18  action motion, the government wrote it is the fact that

19  the trips were personal in nature and not related to CMEEC

20  business that violated the law.  So that's at page 36.

21  But then later on they argue, in response to the

22  intentional misapplication argument, that they don't have

23  to prove that it was purely personal and unrelated to

24  corporate business.  Our view is there is no allegation in

25  this indictment that what was -- that these funds were

1    used for an otherwise legitimate purpose.  And therefore

2    the government should be precluded from moving forward on

3    intentional misapplication because we think it will create

4    confusion and it is irrelevant.

5          THE COURT:  So, of course, the ordinary rule, I

6    know you're familiar with it, is that the government

7    indictment ordinarily has to track the language of statute

8    and that the government may then, with its evidence, try

9    to prove lots of times alternative prongs there, and the

10    Court doesn't usually sit in judgment and say, basically

11    kind of almost summary judgment style and say the

12    government hasn't shown a genuine issue of fact to proceed

13    under prong number 5.  Why is this case really different?

14          MR. MURPHY:  It's different, Your Honor, because

15    on the face of what's alleged I think Your Honor can tell

16    that there is going to be no suggestion here of an

17    otherwise legitimate expenditure of these funds.  This is

18    not a situation where, for instance, the Smart Grid Grant

19    money that is alleged to provide the federal jurisdiction

20    was used, for instance, to buy a new diesel generator for

21    peaking power, because that would be a legitimate CMEEC

22    expense, it just wouldn't be a legitimate CMEEC

23    expenditure of those funds which were given for another

24    purpose.  That's what intentional misapplication is about,

25    according to *Urlacher*.  What is alleged here is one of the

1    first four options, presumably.  So our point, Your Honor,

2    is the Court obviously acts as the gatekeeper of what goes

3    to the jury, and what we have a very real concern about

4    and we -- we have a very real concern about is that at

5    some point in time the Court is going to have to charge

6    the jury on this.  And if it isn't down to a improper use

7    of for personal purposes versus no corporate purpose, then

8    the Court is going to have to instruct the jury on some

9    kind of sliding scale of how corporate does it have to be,

10   how personal does it have to be.  Our view is that, as

11   Attorney Raabe said earlier, is necessarily

12   constitutionally deficient in terms of due process, fair

13   notice, vagueness.  It is the case that this indictment

14   charges conduct under the first four prongs of that

15   statute and there's nothing alleged that would fit the

16   *Urlacher* definition.

17          THE COURT:  Thank you.

18          Government.

19          MR. McGARRY:  Yes, Your Honor.  And Mr. Murphy

20   used this case to try to argue a number of things.

21          Reading *Urlacher*, *Urlacher* stands for the

22   proposition that it is not a defense to say but I used it

23   for another legal purpose.  You can't do that.  That's not

24   a defense.  Or the jury can still find the defendant

25   guilty.  You get a grant for bulletproof vests, it says

1   this is for bulletproof vests, here's $100,000.  Or maybe

2   better yet, body cameras.  The public wants body cameras,

3   here's $100,000 for body cameras.  And then the chief in

4   some made-up city says thank you for the money, I'm going

5   to use it for our canine division.  Big dog fan.  I'm

6   going to take this federal grant.  And then he comes in

7   front of the jury and says I used it for the police

8   department, how can I have misapplied it?  *Urlacher* says

9   no, the grant was for body cameras.  You intentionally

10  misapplied it.  And the fact that it was for a legal

11  purpose within the police department is not a defense.

12  The jury can still find you guilty.  That's what *Urlacher*

13  stands for.  It doesn't stand for, as you alluded to, the

14  proposition that, well, I'm going to strike this part of

15  the statute based on *Urlacher* because the decision in that

16  case doesn't mean that courts now are going to then say,

17  well, I'm going to strike that, strike that.  So first of

18  all, that's my argument on *Urlacher*, that it carves out an

19  additional -- doesn't carve out.  It says this is how you

20  can find consistent with the statute, consistent with the

21  intent of Congress as to how someone has violated this

22  statute.  But it can't then be used to cabin the

23  government's evidence and to have the Court strike

24  language, as you said, from the indictment.

25          One could as, for instance, in the *Perrotti*

1    case, but also in the case of *United States v. Naiman*,

2    N-A-I-M-A-N, 211 F.3d 40, which is a Second Circuit case,

3    and specifically the Second Circuit says misapplication,

4    says the government presented evidence to sustain Naiman's

5    conviction for misapplication.  The uncontroverted

6    evidence at trial showed that Naiman cashed at least five

7    SYRIT checks at Reliable.  It was reasonable for the jury

8    to conclude that Naiman misapplied the funds.  Here in

9    this case, Your Honor, there were checks made out to

10   someone else, he took them, cashed them, took them for

11   personal purposes.  So the court there, the Second

12   Circuit -- and this is a 2000 case well after *Urlacher* --

13   used the term "misapplication" for an illegal purpose.

14   Just because *Urlacher* says it can be used for

15   misapplication of funds also to a legal purpose does not

16   mean that *Urlacher* stands for the proposition that the

17   government can't use that verb, that prong, were it to be

18   misapplied for an otherwise illegal purpose.

19            Mr. Murphy then goes on to say, I think in his

20   brief and in others, that the government now has to prove

21   that every jot and tittle of the trip was 100 percent

22   wholly exclusively solely for personal purposes.  Those

23   aren't the words in the indictment.  And those aren't the

24   words of the statute.  The statute says did you, you know,

25   convert, embezzle, steal, take without authority, or

1    misapply, I think those are the five, more than $5,000

2    from an entity that received $10,000.  So the fact that,

3    you know, if one member of the -- again, I'm using a

4    hypothetical, but to our facts -- if one member of the

5    Kentucky Derby group bumped into somebody else and said,

6    hey, we should do lunch sometime, let's talk about solar

7    power, the Court does then not instruct the jury if you

8    find that there was some scintilla of evidence that the

9    defendants somehow did something related to electricity

10   that you must find the defendants not guilty.  That's not

11   the jury instructions, that's not the charge.  They seem

12   to be trying to weave in the word "solely" and that the

13   government has to proof that -- I think we say that they

14   were for personal purposes.  It was a party.  It was a

15   trip.  It was a boondoggle.  It was a trip to the

16   Kentucky Derby.  There was drinking.  There was meals.

17   There's not a hundred percent rule in the jury

18   instructions.  There's not a hundred percent rule in the

19   elements.

20          And I think -- so that's on that point.

21          And then finally, I don't think there's a due

22   process problem because we alleged what we alleged in the

23   indictment and we're going to prove what we alleged in the

24   indictment.  And I think we are entitled to all four

25   prongs.

1           Also when reading all these -- and I think this

2    goes to this point, Your Honor -- when reading all these

3    requests, request for charge, some of the instructions,

4    they seem to want to make the government have to use the

5    word like "take" and that somehow they had to get the

6    money, like you had to put it in your own pocket.  Which

7    is one way the statute could be violated.  But there's

8    also conversion.  Or misapply.  If you take CMEEC money

9    and then you use it to buy golf outings or you use it to

10   buy tickets for your friends, your mother-in-law, you've

11   converted it.  And I think what they're trying to do is

12   weave into your jury instruction if it doesn't go into the

13   defendant's pocket, if it doesn't go in his own bank

14   account, the jury should find him not guilty.

15          This is one of those motions where they're

16   saying, well, due process requires the government to

17   prove, you know, solely exclusively 100 percent.  And, you

18   know, I reject that argument, as I think the Court should

19   as well.  But also I think due process requires us to

20   prove the indictment.

21          And I think, just to take it one step further,

22   if we were to come out in our opening statement, which

23   Ms. Karwan asked for 20 minutes and they're getting 50, I

24   would have asked for 25, but I'll leave that to the Court.

25   If we came out and said, hey, these trips were great,

1   these trips were for corporate purpose, these trips were

2   fantastic, they helped CMEEC, but that's not what the

3   money was earmarked for so therefore you should find them

4   guilty because it's a legal purpose but they technically

5   misapplied it.  The bulletproof vest/canine argument.  If

6   we were to pivot, which we are not, and do that, then

7   there might be a notice due process argument.  But there's

8   not a due process argument for us proving specifically

9   what's in the indictment and proving it using all five of

10   the verbs that Congress has put in the statute.

11              THE COURT:  Thank you.

12              Anything else on this motion?

13              MR. MURPHY:  Just very briefly, Your Honor.

14              Mr. McGarry made reference to it's not in the

15   words of the indictment that they have to prove no

16   corporate purpose and that this was purely personal.  I

17   suggest to Your Honor that Paragraph 19 is those words in

18   the indictment and ask the Court to take a look at that.

19              And then on this idea that, you know, it's not

20   100 percent, well, Your Honor, that's the problem we've

21   had going back to the motion to dismiss stage of this

22   case.  If it's not 100 percent, then what is it?  Where is

23   the line?  Where is it drawn?  Why is it that we can shift

24   over this?

25              Our point comes back to *Urlacher* says what

 1   *Urlacher* says.  It's still law of the Second Circuit, and

 2   misapplication doesn't apply here.

 3           THE COURT:  Hold on a second.

 4               (Pause.)

 5           THE COURT:  Folks, we're going to take a

 6   15-minute to 20-minute recess at this point for our court

 7   reporter.  I expect we'll resume and go to 1:00 or 1:15.

 8   At that point we'll break for the day.  And then later in

 9   the week, as time allows, probably mostly I think on

10   Thursday after we complete the full jury selection

11   process, we'll continue taking up the motions in limine

12   that we have not done so far.

13           If you all think there's a motion that's very

14   important for me to hear about today as opposed to the

15   possibility it could be heard about on Thursday, please

16   feel free to let me know about that.

17           MS. KARWAN:  Can I let you know now, Your Honor?

18           I think the motion, although the government

19   doesn't have a dog in the fight, but the motion in terms

20   of Mr. Bilda's assertion of a defense that may conflict

21   with CMEEC's privilege.  I think knowing where the

22   contours of that are going to be ahead of time is critical

23   to the presentation of evidence.

24           THE COURT:  I see.  Okay.

25           I don't think -- do we have -- do we have

1    response yet?  I know, Mr. Murphy, you filed the motion.

2    Is there a response?

3              MS. KARWAN:  The government wasn't planning on

4    responding, Your Honor, because I understood Mr. Murphy to

5    be asking CMEEC to do something or not do something or the

6    Court to do something or not do something.

7              MR. McGARRY:  Five seconds, Your Honor?

8                   (Pause.)

9              THE COURT:  Let me do this.  Let me look at that

10   motion during our break and we'll talk a little more at

11   the outset.

12             MR. BARRETT:  We'd also like to raise the motion

13   to quash filed by QuintEvents.

14             THE COURT:  Yes, okay.  We'll talk about that as

15   well.  I don't gather that counsel -- Mr. Cerritelli I

16   think filed the motion.

17             MR. BARRETT:  I have not seen him.

18             THE COURT:  We might not be able to cover that

19   motion in detail today, then, if he's not here.  But we'll

20   mention that as well when we start again.

21             MR. BARRETT:  Thank you, Your Honor.

22                   (Whereupon, a recess followed.)

23             THE COURT:  So with respect to the -- it's

24   Document Number 364, Mr. Bilda's motion concerning claim

25   of privilege by CMEEC.  I don't know, Mr. Murphy, if

1    you've heard more from Mr. Martini, I assume?

2              MR. MURPHY:  I have heard nothing further.  I

3    spoke to him after receiving the email that's attached to

4    our motion.  At that time -- well, no discussion of what

5    he was going to respond to.  We hadn't filed our motion.

6              THE COURT:  All right.  I'm wondering if I need

7    to ask him to file a response.

8              MR. MURPHY:  From our perspective, Your Honor,

9    the issue is of such significance that I don't think that

10   the Court needs that, but --

11             THE COURT:  I understand.

12             MR. MURPHY:  -- I understand why you would want

13   it.

14             THE COURT:  Okay.  Let me think about that.

15             MS. KARWAN:  Your Honor, it's my understanding

16   that Mr. Martini is in the courthouse today.  We told him

17   it might be helpful for him to come up after his hearing

18   with Judge Arterton.

19             THE COURT:  That would be fine.  Maybe we'll be

20   able to deal with that further.

21             And I know, from the government perspective, you

22   want guidance on that earlier than --

23             MS. KARWAN:  Your Honor, we subpoenaed both the

24   current general counsel and the former general counsel and

25   plan to elicit what we believe is non-privileged

1    testimony.  But to the extent that the contents of

2    communications, especially with the former general

3    counsel, were going to come in, we would like to offer

4    those in our case in chief.  If they're not going to come

5    in at all, we would like to know that before we call the

6    general counsel.

7              THE COURT:  Right.

8              I think, for your planning purposes, in light of

9    what I've seen from Mr. Murphy's motion, it's likely that

10   I would -- I'm leaning towards allowing it in some manner

11   for the reasons he indicates there.  But I do need to know

12   more about it, I need to study it a bit more.  For your

13   planning purposes, you should make sure your processes are

14   in place to do that, as you're saying.

15             MS. KARWAN:  Understood.

16             THE COURT:  All right.

17             So I guess that gets us back to our list.  And I

18   understand that with respect to the subpoena issue, the

19   motion to quash as to QuintEvents, that counsel for

20   QuintEvents is available at 2:00 p.m. on Thursday.  So we

21   can take that up then.

22             MR. BARRETT:  Thank you, Your Honor.

23             THE COURT:  And I think that gets us to our next

24   motion.  It looks like it's Number 314.

25             MR. NOBLE:  Your Honor, Dan Noble for Mr. Pryor.

1          The defendants conferred, and we thought it

2    might make sense to take up Motion Number 329, which is

3    the motion to dismiss Counts Three and Four and to narrow

4    Count One, only because it follows so closely on the heels

5    of the motion that Mr. Murphy argued regarding the

6    identity of the members of CMEEC as alleged in the

7    indictment.

8          THE COURT:  Okay.  I'm familiar with the motion.

9    If you'd like to be heard on it.

10          MR. NOBLE:  Yes, Your Honor.

11          So, Your Honor, the defendants have jointly

12    moved to dismiss Counts Three and Four for lack of

13    jurisdiction and with respect to Count Four for failure to

14    state an offense.  And here following on the heels of what

15    Mr. Murphy was arguing about the importance of the

16    identity of either the government or the agency under

17    666(d)(2), that has significance for purposes of

18    determining whether there's even jurisdiction for an

19    offense.

20          So in the defendants' view, we think under the

21    plain terms of the statute there has to be what we call

22    alignment between the entity, the agency or the government

23    that received the federal funding in excess of $10,000 per

24    year that the defendants were an agent of and from whom

25    the funds, the money, was allegedly stolen or embezzled,

1    et cetera.  There has to be alignment.  Has to be the same

2    government, same agency.

3            With respect to Count Four, taking Count Four on

4    its face fails to state an offense because the government

5    has alleged that the funds that were allegedly stolen or

6    embezzled with respect to the trips was owned and

7    controlled by CMEEC.  It does not, contrary to what's

8    alleged in Count One, the conspiracy count, state in

9    Count Four or Count Three or Count Two, for that matter,

10   that the funds were owned by the CMEEC members.  And

11   that's significant because that is an essential element of

12   the offense.  At trial the jury is going to have to

13   determine who owned the money.  And the grand jury has

14   already made a probable cause determination that it was

15   CMEEC.  CMEEC is a separate legal entity.  Under the

16   Connecticut statute, the enabling act that we were talking

17   about earlier, Section 7-233b(7) where it defines a

18   municipal electric energy cooperative, it states that it

19   means a separate legal entity from the municipal electric

20   utilities that are the members.

21           So this is significant because the government

22   has alleged in Count Four and the other substantive counts

23   that CMEEC owned the money.  However, the government has

24   also alleged that defendants were only agents of the

25   members in that count.  So there's a mismatch between the

1    agency that purportedly owned the money that was stolen

2    and the agency of which the defendants are alleged to have

3    been an agent and which purportedly received greater than

4    $10,000 in federal funding.  So on the face of Count Four

5    itself, because of that mismatch, it's improperly alleged.

6    And for the government --

7              THE COURT:  So we had arguments a few years ago

8    about the sufficiency of the indictment.  Is it proper to

9    be raising that now?

10             MR. NOBLE:  Yes, Your Honor, because it also

11   goes to whether there's jurisdiction.  And the Court can

12   take up whether there's jurisdiction for a particular

13   count of an indictment at any time.

14             So with respect to the allegation that CMEEC

15   owned that money, there's no corresponding allegation that

16   CMEEC received the federal funding or that the defendants

17   were agents of CMEEC for that 2016 charge.  And really the

18   elephant in the room here is that the government seems to

19   be bending over backwards to try to find some way for

20   there to be jurisdiction to reach that 2013 conduct.  That

21   gets to their underlying evidence that they've proffered

22   in response to the bill of particulars which is, you know,

23   what were the sources of federal funding that CMEEC

24   received.  And the only thing that the government has

25   pointed to, it's beyond dispute, is the ConnSMART Grant.

1    And the ConnSMART Grant itself ended in 2014.

2    December 31, 2014, was the cutoff date for any expenses

3    that could be reimbursed under that program by the

4    Department of Energy.  I think that's beyond dispute.  So

5    there's no allegation that CMEEC received the requisite

6    federal funding that would provide jurisdiction for

7    Counts -- well, Count Three or Count Four, but sticking

8    with Count Four for now.  So we think it's deficient on

9    its face, but even looking at the government's evidentiary

10   proffer for Count Four, it's insufficient.  They're not

11   going to be able to show that CMEEC received any federal

12   funding in 2016, and that's fatal to Count Four.

13           On Count Three --

14           THE COURT:  Has the government made a full

15   evidentiary proffer?  I realize that there was a bill of

16   particulars and they directed you to particular evidence.

17   But does that count as being a full evidentiary proffer?

18           MR. NOBLE:  Your Honor, I think in this

19   situation it does.  We made a request for a bill of

20   particulars.  The government pointed us to the

21   ConnSMART Grant funding.  There's no dispute that the

22   funding ended earlier.  I don't think the government can

23   even dispute that the funding ended no later than

24   December 31st of 2014.  But with respect to 2016, there's

25   not even an allegation in the indictment that CMEEC

1    received any federal funding in 2016.

2           So I think at least for Count Four, Your Honor,

3    I think it's pretty clear that the government has made a

4    full factual proffer and the allegations, you know, in the

5    indictment on their face are insufficient.

6           And why this is important is, again, the

7    government says this would not be a constructive amendment

8    of the indictment.  However, this is an essential element

9    of the offense.  The grand jury found that CMEEC was the

10   owner and controller of the funds that were allegedly

11   stolen that were used to pay for the trips.  And for the

12   government to go forward at trial and to introduce

13   evidence that another separate legal entity, either the

14   utilities, which they haven't alleged in the indictment,

15   or the member towns, which is fatally flawed for the

16   reasons that Mr. Murphy argued, that would work a

17   construct amendment of the indictment because they would

18   be trying to prove there was actually a different victim

19   entity than the grand jury found there was probable cause.

20          The government says, well, those counts

21   reference back to -- reference by incorporation the

22   allegations in Count One.  But I think that only works to

23   prove that the government and the grand jury knew how to

24   allege that the funds were owned by both CMEEC and the

25   CMEEC members, as it does in Count One, versus in the

1    substantive counts where only allegations that CMEEC was

2    the owner of the funds.

3          So, you know, again, Count Four we think should

4    be dismissed because it fails to state an offense.  And in

5    any event, there's no jurisdiction because the government

6    has made what amounts to a full factual proffer of what

7    its proof would be on federal jurisdiction for CMEEC.

8          On Count Three, it's a similar argument that

9    because of that full factual proffer CMEEC did not receive

10   sufficient federal funding in 2015.  Again, the only

11   source is the ConnSMART Grant.  The documents clearly show

12   that CMEEC received less than $10,000 for 2015.  And

13   really our argument is that those were benefits that were

14   received back in 2014.  And here, the question of what

15   constitutes a benefit for purposes of 666, the

16   Second Circuit has held is actually a legal question for

17   the Court.  Going back to *Fischer*, the Supreme Court case

18   that's important on this question, in *Fischer* the

19   Supreme Court said it's not just enough for the government

20   to allege or prove that an entity, an agency, or an

21   organization received federal funds because that would

22   bring in way too much conduct, it would be an

23   overexpansive interpretation of the statute.  You have to

24   look at the structure, the purpose, and the organization

25   of the federal grant program.  And here, if you look at

1    that with respect to the ConnSMART program, it's clear

2    that it's not just CMEEC.  It may be the lead grantee, but

3    it's not the only grantee.  The individual utilities,

4    which are separate legal entities, were also subgrantees.

5    So it's disingenuous for the government to argue that all

6    that money that came in in 2015 for 2014 expenses all

7    belonged to CMEEC.  They're making basically the exact

8    opposite argument when it comes to whether money was

9    stolen from CMEEC or the members.  They're saying even if

10   it's stolen from CMEEC, it's actually stolen from the

11   members.

12            Here though, the grant, the purpose of the grant

13   program was to install these smart meters.  And

14   installation of the smart meters was done on the

15   individual utilities.  They receive reimbursement from the

16   Department of Energy.  Yes, CMEEC was the conduit, the

17   bank account through which those funds passed, but really

18   CMEEC was just acting as a grant administrator.

19            So our argument is that the Court has to look at

20   the structure, purpose, and organization of the grant

21   program.  All of the benefits that CMEEC received occurred

22   in 2014.  But even assuming the Court should look at when

23   the money hit the bank account in 2015, the amount of

24   money was less than $10,000 and therefore insufficient as

25   a matter of law to provide federal jurisdiction for

1      Count Three.

2              And then Count One, Your Honor, I won't belabor

3      the point, but we believe should be appropriately narrowed

4      based on the dismissals of Count Three and Count Four.

5              THE COURT:  So I take it then part of your

6      argument relies on the notion that if the federal

7      government, for example, gives the New Haven Police

8      Department a grant of $20,000 in a calendar year and the

9      New Haven Police Department gives that money, in turn, to

10     community anticrime organizations, $19,000 out of the

11     $20,000, then your argument would be that the New Haven

12     Police Department and then the police chief, as we've said

13     before, takes money from the New Haven Police Department,

14     I think your argument would be that's not chargeable as a

15     666 because the New Haven Police Department was just

16     passing through the federal monies to third-party

17     entities; is that right?

18             MR. NOBLE:  Well, I think that question,

19     Your Honor, is governed by the Supreme Court's decision in

20     *Fischer* where they were assessing the reimbursement under

21     the Medicare program for hospitals versus the funds that

22     flowed to the beneficiaries.  There the court said you

23     have to look at the structure and the purpose and the

24     operation of the grant program itself.

25             THE COURT:  Is that a fact question?

1          MR. NOBLE:  We believe it is -- well, the

2    Second Circuit in United States v. *Bahel*, and there's also

3    Federal Appendix cited case of *Insaidoo* -- I'm not sure if

4    I'm pronouncing that correctly -- said it's actually a

5    legal question for the Court to determine what constitutes

6    a benefit under federal grant.

7          THE COURT:  A legal question that's informed by

8    the facts, perhaps, that might be introduced at trial?

9          MR. NOBLE:  It could be.  And could be a mixed

10   question of law and fact.  The Second Circuit says clearly

11   it's a question for the Court, but it could be based on

12   how the facts develop.

13         THE COURT:  Would it be better, then, to see how

14   the facts develop at trial rather than me deciding the

15   facts right now?

16         MR. NOBLE:  If the Court's decision on this

17   question turned on whether these were benefits, which is a

18   mixed question of law and fact or application of the law

19   to the fact, then yes.  But I don't think the Court even

20   needs to reach that question because even assuming that

21   the money was received in 2015, the money that was

22   received by CMEEC, the benefits received is less than

23   $10,000.  And, you know, I don't think -- the government's

24   kind of trying to have it both ways in arguing that, you

25   know, for some purposes it's all CMEEC's money, but for

 1    other purposes it's CMEEC's money and it's the members'

 2    money.  So, you know, we think consistency here is

 3    important.

 4              THE COURT:  Okay.  Thank you.

 5              Government?

 6              MS. LEVENS:  Thank you, Your Honor.  I'll try to

 7    be brief and not say too much repetition from what's in

 8    our papers.

 9              Starting with Count Four, I think, as the

10    argument today has shown, this is a classic mixed question

11    of fact and law.  I think the dispute here is whether

12    there is evidence that would show that CMEEC money, money

13    that's owned by CMEEC, is also owned by or under the care,

14    custody, and control of the member towns.  I think the

15    government does have evidence that we intend to offer at

16    trial, through both documents and also through witnesses,

17    that would show that CMEEC money is owned by the member

18    towns.  The membership agreement sets forth the ownership

19    by interest percentage or interest share of the towns.  So

20    I think there is ample evidence that we will put on that

21    appointment.  One example is that the town's financial

22    statements do report out the money that they hold at CMEEC

23    as assets on their balance sheet, and in CMEEC's books and

24    records they classify those same assets as liabilities.

25    That, to us, demonstrates ownership.

1          Again, Your Honor, I think this is a mixed

2     question.  I don't think it's appropriate for resolution

3     on a motion to dismiss.

4          I think that dovetails into Count Three.

5          On Count Three I think just to start at the very

6     beginning, Your Honor, the government has not made a full

7     proffer of evidence here as the Second Circuit has

8     recognized in the cases like *Mennuti*, M-E-N-N-U-T-I,

9     639 F.2d 107.  That's the one case that I've seen the

10    Second Circuit characterize as a case where the government

11    does give a full factual proffer.  In that case the

12    government has submitted an affidavit that explains point

13    by point the evidence it was going to offer at trial.

14    That's not what the government has done here.  We've

15    turned over our full discovery and also marked our exhibit

16    list and that exhibit list has continued to change.

17    That's the first issue.

18          As to Count Three, I think the operative word in

19    the statute is "received."  The entity that received the

20    federal funds.  And that documents that the defense

21    submitted in support of its motion I think just emphasize

22    a number of times in a number of different places that

23    CMEEC is the recipient.  For example, Document 329-3 at

24    page 2, the grant was awarded to CMEEC.  329-3 at page 19

25    the Department of Energy agreement defines the recipient

1    as the entity that has directly received the federal

2    funds.  Page 37 of the same document, the recipient is

3    listed as CMEEC.  CMEEC is submitting the request for

4    reimbursement on behalf of the rest of the towns.  All of

5    the grant documents are signed by CMEEC officials, not by

6    town officials.  And I think we're going to have

7    additional testimony at trial that will further support

8    from the Department of Energy's perspective it's only the

9    lead grantee, the lead applicant that they are interfacing

10   with.  And that's the entity on the hook for making sure

11   any of its grant partners interact with and follow federal

12   law appropriately.

13            Now, I think also if you accept the defendants'

14   argument on Count Three, it also looks like they're trying

15   to have it both ways.  Because if the argument is that

16   money is just passing through CMEEC and CMEEC has received

17   the federal funding and is passing it on through to the

18   towns, Count Three alleges both, that there was money

19   received by CMEEC and by the member towns in all three of

20   the places where the defendants say it should be alleged.

21   So even if you take their position and CMEEC is just

22   acting as a pass-through and CMEEC itself didn't receive

23   over $10,000 in federal funds, that money is just going to

24   the member towns.  And I think, as the documents that

25   they've introduced that they've attached to their motion

1   show, each of the towns received over $10,000.  So I think

2   even if you take their argument on Count Three,

3   Count Three remains sufficient.

4            Unless the Court has further questions --

5            THE COURT:  I don't think so right now.  Thank

6   you.

7            Mr. Noble, anything else?

8            MR. NOBLE:  Just briefly, Your Honor.

9            Again, it's not the member towns, it's the

10  municipal electric utilities.  They were the subgrantees

11  of the grant.  They were on the application.  They were

12  part of the budget.  It's not the towns that are getting

13  the money under the ConnSMART Grant; it's the utilities

14  themselves.  Just a factual point on that.

15           But more importantly, as a legal matter, each of

16  the substantive counts does not allege that the funds that

17  were stolen belong to the members of CMEEC, be they the

18  member towns or the utilities themselves.  It alleges that

19  CMEEC was the owner and the controller of the funds.

20  Therefore, for there to be a viable 666 violation, the

21  government has to show that CMEEC itself received

22  sufficient federal funding and that the defendants were

23  agents of CMEEC.

24           And again, it's not only who receives the money.

25  There's really no dispute that the money all flowed

1   through a ConnSMART account that was segregated and set up

2   by CMEEC to receive the reimbursement funds from the DOE,

3   but they did that on behalf of the subgrantees, the MEUs,

4   and immediately passed it on.  As we pointed out in our

5   brief, the last disbursement occurred on March 31st of

6   2015, over $8,000 flowed into the bank account.  Now, the

7   government's initial version of the exhibit didn't include

8   the next month's statement for May of 2015 which showed

9   the very next day all of that money flowed out.  And if

10   you look at CMEEC's operational account, they get less

11   than $10,000.  The rest of the money goes back to the

12   utilities.  Under *Fischer*, it's not enough to look at who

13   got the money.  You have to look at what constitutes a

14   benefit, who received the benefits.  And in this case it

15   was the utilities and not CMEEC itself.  Thank you.

16             THE COURT:  Thank you.

17             Okay.  So I think was that it in terms of

18   out-of-order motions?  All right.

19             Looks like we're back to, I think, 314, which is

20   the one concerning the joint motion to preclude evidence

21   of other investigations or proceedings.  It looked to me

22   that the government doesn't intend to introduce any kind

23   of conclusions, any findings of the various proceedings at

24   issue that are referenced in defendants' motion.  It

25   looked like those included a couple of the towns did

1    ethics investigations, that CMEEC itself hired an attorney

2    to do a review and also an accountant to do a review.  I'm

3    not familiar with ins and outs of all of these

4    investigations.  But it strikes me, Mr. Healy, that the

5    argument you're making is -- I'm trying to figure out what

6    is the argument you're making there.  It looked to me that

7    if the government is saying they're not going to put in

8    the conclusions of those investigations, which clearly

9    they shouldn't, then you say I think in a footnote in your

10   motion that they can bring in sworn testimony or sworn

11   statements.  It's not clear to me why they can only do

12   that if there's a statement that would otherwise qualify

13   as a defendant's statement, 801(d)(2)(A).

14              MR. HEALY:  Our position, Your Honor, is that --

15              THE COURT:  I'm a little bit -- I'm really not

16   clear on what you're trying to stop.

17              MR. HEALY:  Let me see if I can clarify,

18   Your Honor.

19              Our position is that if the government has a

20   statement or sworn testimony, whatever it may be that they

21   can use as appropriate, they can use that testimony.  What

22   they can't do that is say that that statement or that that

23   testimony came from an ethics commission proceeding.  As I

24   understand their papers, their position is to say we need

25   that for context, we need to be able to tell the jury

1    where that came about from.  Our view is that that's not

2    appropriate.  This Court routinely uses the sort of

3    generic descriptions of "prior testimony" or "prior

4    statement" as appropriate and that that sufficient for

5    juries.  They can and do evaluate testimony or statements

6    without any more of the background information that the

7    government would submit.

8              THE COURT:  Doesn't it matter, though?  Doesn't

9    context matter?

10              MR. HEALY:  In terms of this -- in these

11   proceedings, Your Honor, if we're going to describe a

12   statement as coming from an ethics commission, for

13   example, that's not going to affect anyone's understanding

14   of the actual statement.  The statement, as a matter of

15   fact or what have you, will speak for itself.  But what it

16   will do is it will inject unfair prejudice in the minds of

17   the jurors.  For our part, it forces us to go down the

18   rabbit hole of explaining the multitude of differences

19   amongst these prior inquiries.

20              For example, Your Honor, as you noted, all of

21   them are noncriminal.  All of them involve very different

22   burdens of proof than this jury is going to be asked to

23   evaluate.  All of them were conducted by private parties,

24   including in the ethics commission is by untrained

25   volunteers.  We're going to have to tackle the host of

1    political and economic motivations that are on the part of

2    the folks making that inquiry and the fact that we're

3    dealing with an entirely different focus.  The ethics

4    commission is talking about a municipal gift policy which

5    has nothing to do with the Federal Criminal Code that's

6    going to be at issue here.

7            From our perspective, Your Honor, the bottom

8    line is that any reference to Ethics Commission, these

9    other sort of investigations, is going to be incurably

10   prejudicial in the minds of the jury with respect to these

11   defendants.  And it's going to add that sort of

12   unnecessary sideshow to what we've talked about as an

13   already tight trial schedule in this case.  And if this

14   case is about whether or not these retreats had any

15   corporate value or whether, as the government posits, were

16   purely personal, that has nothing to do with -- the jury

17   doesn't need to know where a statement came from in order

18   to reach that conclusion.

19           Our view is if a statement is proper to be used,

20   it could be used.  It doesn't need background description

21   to just let the jury know there was an ethics commission,

22   that's where this came from.  That adds nothing to the

23   evaluation of the statement on its merits.

24           THE COURT:  Why does it really prejudice you

25   then?

1           MR. HEALY:  Your Honor, we're now going to have

2    to tackle why we have an ethics commission, who the ethics

3    commission was, what they were doing, the Norwich gift

4    policy, what it is, what it isn't, how it's different from

5    666.  I'm not sure the jury needs to hear that from a time

6    perspective, but also again if what we're talking about

7    here is whether or not these retreats had a corporate

8    value, municipal ethics policy or what the outcome of that

9    process is, I don't know that that's worth injecting into

10   the minds of a juror when their focus is on a much more

11   narrow topic.

12           THE COURT:  I take it your argument is the same

13   with respect to both the government's case in chief and if

14   your client ends up testifying?  So you would say that

15   your client is on the stand and testifies that a

16   particular fact is true, then the government is barred

17   from saying, well, isn't it true on such and such date you

18   said something different?  And they couldn't get into at

19   that point and say isn't it true on that date you were

20   testifying before an ethics committee or you were meeting

21   with counsel for the CMEEC authorizing body and you told

22   that person something different?

23           MR. HEALY:  I don't think they need to identify

24   it's before an ethics commission, Your Honor.  I think if

25   they want to say did you give testimony on this date, were

1   you under oath, did you swear to tell the truth, all those

2   things, that's the context that matters for a jury to

3   evaluate that prior testimony.  To add on the zing that it

4   was before an ethics commission, I think that's designed

5   to be unfairly prejudicial.

6          THE COURT:  I see.  Thank you.

7          Government.

8          MS. LEVENS:  Thank you, Your Honor.

9          In addition to what we laid out in our papers

10  explaining why context would be appropriate in this

11  situation, I would just also add the fact that these are

12  municipal ethics commissions that are running these

13  investigations also goes to show the interests of

14  municipalities in the conduct that's going on here and the

15  fact that the towns have an interest in this conduct and

16  the conduct of CMEEC more generally as well as the fact

17  that the defendants may have acted without authority if

18  the municipal ethics commission saw fit to go ahead and

19  open these investigations.  Other than that, unless the

20  Court has questions, I'll rest on what's in our papers.

21         THE COURT:  Can you repeat that last point you

22  just made?

23         MS. LEVENS:  Sure.

24         So the fact that there are ethics commissions

25  that are run by these municipalities that are looking into

1    whether the defendants' conduct was appropriate would seem

2    to be relevant to whether the defendants acted without

3    authority in taking funds that otherwise belonged to the

4    member towns and would have been used for the member

5    towns.

6              THE COURT:  So if this were, say, a bank robbery

7    case, you would say the fact that the police did an

8    investigation is relevant?

9              MS. LEVENS:  Well, I think, Your Honor, here it

10   goes to the body that's doing the investigating.  I think

11   the fact that the towns are looking into potential

12   violations goes to show at least -- is relevant to the

13   towns' interest in what's going on here.

14             THE COURT:  So the town has an interest.  Why is

15   that -- I guess I was -- I'm a little mystified by that

16   notion that somehow you can bootstrap the notion that the

17   town is doing an investigation into suggesting there must

18   be something improper.  I would think that you would -- I

19   would think you'd say -- I thought your argument was we

20   can, to impress upon the jury the context in which these

21   statements were made, we can bring out the fact that they

22   were made in the course of such-and-such type of

23   proceeding, but the jury certainly should draw no adverse

24   inference against any of the defendants because of the

25   fact that there was such an inquiry or proceeding.

1    Otherwise, you're basically trying to give some imprimatur

2    to the fact that the town or any governmental agency or

3    CMEEC itself decided to conduct an investigation here.  To

4    me, that's kind of the same ilk of putting in the

5    investigative conclusions.

6            MS. LEVENS:  Certainly, Your Honor.  And I might

7    have overstated our position just slightly.

8            I do think the fact -- Your Honor's correct that

9    we're not trying to sort of draw an adverse interest

10   against the defendants here.  The context of that entire

11   setting goes to show the seriousness of what's going on in

12   those situations.  It helps the jury understand sort of

13   why the defendants are offering the testimony that they

14   did offer and the gravity that goes towards their

15   testimony.

16           THE COURT:  I take it if I denied the

17   defendants' motion here, you wouldn't oppose at least

18   giving a limiting instruction saying that the jury should

19   draw no inference in terms of what the conclusions of any

20   investigation were or from the fact that any investigation

21   was even initiated?

22           MS. LEVENS:  That's correct, Your Honor.

23           THE COURT:  Thank you.

24           MS. LEVENS:  Thank you.

25           THE COURT:  Anything else, Mr. Healy?

1          MR. HEALY:  Your Honor, I submit the only

2     inference the jury is going to draw if they hear about

3     ethics commissions and municipal gift policies, which are

4     not illegal under 666, is a different task for this jury

5     to hear.  If they're told about ethics commissions, that's

6     the unfair prejudice no matter what any instruction given.

7     Because that statement or that testimony can be evaluated

8     without that description, I'd say that's a much safer

9     course.

10          THE COURT:  Understood.  Thank you.

11          MR. DOW:  Can I just be heard on that?

12          THE COURT:  Yes, Mr. Dow.

13          MR. DOW:  Briefly.

14          The magic word is "ethics."  Once you say

15     "ethics," it just lights a fire that no instruction is

16     going to dissipate.  That's the real problem with it.  To

17     refer to it, as counsel talks about, as a separate

18     proceeding, we have to live with that.  Once you say

19     "ethics," a light goes off and taints the proceedings.  I

20     wanted to amplify, say that.

21          THE COURT:  Your concern isn't as much with the

22     fact that the town was doing an investigation, because it

23     could go under any name, right, as distinct from whether

24     it's dubbed an ethics investigation.

25          MR. HEALY:  And I don't know that we need it to

1   be called a town investigation.  I don't think that that's

2   Mr. Dow's argument.  If we say to the jury the testimony

3   or statement was previously given, they have all they

4   need, Your Honor.  I think that is what Mr. Dow is saying.

5   When you talk about ethics or when you talk about a gift

6   policy, it's a lightning rod in the mind of a juror.  It's

7   inevitable they'll be confused about what their job is

8   versus what Norwich or Groton may have been doing

9   different on an entirely different inquiry using different

10   burdens of proof and all of the problems we talked about

11   before.

12            THE COURT:  Okay.  Thank you.

13            The next, at least on my list here, it's

14   defendants' joint motion in limine to seal three of the

15   other motions in limine that to the extent it appears that

16   they've referenced grand jury or statements that were made

17   in the course of grand jury.  I don't know, has the

18   government taken a position on this motion?

19            MS. KARWAN:  Your Honor, we just asked in our

20   omnibus response, we thought a better course would be to

21   provide redacted motions and to keep them under seal in

22   their entirety.

23            THE COURT:  This is Number 315, the motion.

24            Any concern?  Would the defendants be prepared

25   to file redacted motions that redact solely those portions

1   that refer to grand jury testimony?

2          MR. HEALY:  I think, in our view, we weren't

3   sure any redaction was necessary.  We filed the motion to

4   seal to preserve the government's argument if they thought

5   there was some portion they thought needed to be redacted.

6   I don't know if I'm misunderstanding their position that

7   they don't feel redaction is necessary or if they feel a

8   particular part has to be redacted.  I can't imagine we'd

9   have any problem filing --

10          THE COURT:  A redacted portion.

11          So Ms. Karwan, is there a concern?  Oftentimes

12   grand jury testimony comes out in the public trial.  I

13   don't seal the courtroom for that.  Is there really any

14   reason to deny the motion to seal?

15          MS. KARWAN:  No, not at all, Your Honor.

16          THE COURT:  I'll deny -- I appreciate the fact

17   that it was filed under seal for protective purposes, but

18   I'll deny the motion to seal those three additional

19   motions in limine.  And so those motions in limine will be

20   filed on the public record, and instruct the Clerk of

21   Court to do so.

22          The next motion is Number 316.  It's the joint

23   motion to preclude argument or evidence that the areas

24   served by CMEEC are economically disadvantaged.

25          Mr. Healy.

 1              MR. HEALY:  Yes, Your Honor.  And I'll be brief.

 2          Our point here is that the government can't be

 3   allowed to do what it did in the grand jury, namely that

 4   was to argue or adduce evidence that eastern Connecticut

 5   is not Fairfield County.  We're not aware of any case that

 6   says 666 applies only to an impoverished town but not a

 7   wealthy one.  Neither of the cases cited by the government

 8   come remotely close to that proposition.  Again, the

 9   question here is whether these retreats had any corporate

10   value or whether they were purely personal.  And it

11   doesn't matter to that inquiry whether CMEEC is located in

12   eastern Connecticut or any other part of the state.  So

13   that's the basis for our motion, Your Honor.  If you have

14   questions, I'm happy to address them.  I think we lay it

15   out well in our papers.

16              THE COURT:  I don't think so.

17              MR. McGARRY:  Your Honor, we put in our papers,

18   but I have two points to underscore for the Court.

19          One, I think we're talking about context.  And

20   how it's going to put in context the actions of the towns,

21   including some of our witnesses who are going to say, yes,

22   we were looking at the bottom line, we were looking at

23   costs, we were looking to see how much we would get back

24   from our part of the margin.  So in that sense, you know,

25   if there's some testimony about the town's watching the

1   bottom line, the town's trying to be careful, trying to

2   make sure they account for certain dollars that they have,

3   in essence, on deposit with CMEEC, that they shouldn't be

4   hamstrung and they should be able to say that that was

5   important to us.

6          Second of all, as we point out, the defendants

7   want to argue that CMEEC was doing great, they're making

8   lots of money, so therefore these trips were okay in

9   context, therefore I think the other side of the coin is

10  equally fair game that, well, the towns weren't doing so

11  great so they would have benefited from a little extra

12  money.

13         The other point I'd like to make is that when we

14  start putting in documents, we start putting in -- excuse

15  me.  I don't think we need to be worried -- I don't want

16  to be said that we're not redacting or we didn't find on

17  some page of something it talks about, you know, the

18  finances, that somebody could conclude that there they're

19  in bad financial health, that we need to scour every bank

20  record, every document to get the balances and things of

21  that sort.  That's more of a procedural thing, thinking

22  about our paralegals and our trial team.

23         Finally, and most importantly on this one, is I

24  get concerned when we start, lawyers make arguments about

25  this and we're going to tell our lay witnesses, whether

1   it's a town representative or a mayor, okay, you're going

2   to testify and, oh, by the way, the Judge decided you

3   can't say anything about the economic health of your town

4   or you can't talk about, you know, how well off or if you

5   were having a budget crisis or if money was tight.  And

6   then -- I don't think that's prejudicial.  I think if that

7   comes out, that's a fact.  But also I get concerned that

8   these lay witnesses are asked to start parsing their

9   testimony and then they're sitting there in front of a

10  room full of lawyers and jurors wondering what is the

11  Judge going to allow them to say and what is the Judge not

12  going to allow them to say.  I certainly understand the

13  point of these towns are desolate, they're poor, you

14  should feel sympathy.  That's not the issue.  But the

15  issue is to make sure that the witnesses can testify.

16  That they can answer the questions, they can be as relaxed

17  as they can be, and then if they want to say something

18  like, well, you know, we had a really tight budget year so

19  I was looking at what we were going to get back from our

20  rate adjustment fund because that really important to me

21  and our town, that they don't have an objection and then

22  be told you can't say that because they used the word

23  "tough budget year."  Again, I don't know the full scope

24  of all their testimony, but I know, having met with some

25  of these mayors and representatives, that they're just

1   regular folks.  And I don't want there to be some overly

2   legalistic ruling that they can't just, you know, testify

3   candidly, openly, and honestly.

4          And I don't see the prejudice.  I don't see the

5   403 balancing that, you know, if there's a town that is,

6   you know, struggling, that that can't come out.

7          THE COURT:  I guess I wondered about that.  I

8   don't know why it would be important to the government's

9   case, apart from this issue of somebody might just say on

10  the stand by accident and presumably not responsive to a

11  question, because all of the government counsel are very

12  experienced in asking questions that don't bring out

13  improper information, it strikes me that I can't see why

14  you would want to ask a town official:  So, the year 2015,

15  was that a tough time for the town?  How are the town's

16  finances?  It seems like every single year towns care

17  about their finances.  Everybody is watching every dollar,

18  hopefully.  And I can't figure out why you think -- it's

19  certainly not an element to show extra harm or extra

20  vulnerability to towns here.  I can't figure out why you

21  want to bring that in.

22          MR. McGARRY:  I think it goes to --

23          THE COURT:  Other than the two wrongs makes a

24  right theory.  If they're going to get into CMEEC's

25  financial condition, we get the right to go into the town.

1          MR. McGARRY:  I think there's some of that.  I

2     don't want to espouse that two wrongs don't make a

3     right -- I mean I do want to espouse that two wrongs make

4     a right, but not that the goose/gander, I guess, that the

5     Court said.

6          But I think it goes to the fact -- I think it

7     puts in context what the -- what the witnesses are going

8     to say and for the jury to hear that this was a -- you

9     know, CMEEC had cash flow, not necessarily yield at the

10    end net, but hundreds of millions of dollars, that these

11    trips -- I don't want to call them retreats, but these

12    trips are pennies.  It's couch change.  Because look at

13    all the money that they're buying millions of dollars'

14    worth of electricity like it's not material.  But I think

15    we have the right to show that it in fact is material,

16    that if you take a $300,000 Kentucky Derby trip and you

17    pass it through the margin fund and you pass it to the

18    towns, that's material to them.  It's relevant.

19          THE COURT:  Is your evidence going to show

20    basically the flow of monies?

21          MR. McGARRY:  Sure.  Yes.

22          THE COURT:  So I don't know if the defendants

23    are asking you -- saying you can't show flows of monies

24    into accounts.  The question is, can you start

25    editorializing, basically, right?  The question is can you

1   start asking town officials, you know, was 2015 a tough

2   year or even go into what was the town's -- was the town

3   in the red that year or budget issues.  That's not clear

4   to me why that matters.

5           MR. McGARRY:  I guess, why were you looking so

6   closely at the rate adjustment fund?  That was an

7   important fact to us because, you know.

8           THE COURT:  Why does it matter whether the

9   witness was looking closely at the rate adjustment fund?

10  How does that help you prove your case?

11          MR. McGARRY:  Because I think it puts in context

12  that there's some witnesses who are looking at the

13  expenses of CMEEC.  And then it goes to show the

14  defendants' intent where they move where they're putting

15  the expenses from the A&G and, in essence, hiding them in

16  the margin account making it much less transparent, much

17  harder to see in response to some of the questions as to

18  why expenses are going up under Mr. Rankin.

19          It's really, I think -- at bottom line,

20  Your Honor, I think it's a question-by-question decision

21  by the Court.  And if there's a question that, you know,

22  seems to be objectionable, then it can be objected to at

23  the time.  If a witness is getting too far afield on a

24  particular question, I think at that point either counsel

25  or the Court will say, okay, let me stop you there.  Let

1    me go back to why I asked the question, why were you

2    looking at the expenses.  I don't think it's ripe for an

3    in limine motion at this time.

4              THE COURT:  Mr. Healy, anything else on this?

5              MR. HEALY:  Your Honor, I think your concern is

6    exactly right.  There's no need for -- if we're going to

7    go down this road, the government risks getting into that

8    type of topic, it's not something that has to be getting

9    before the jury particular financial health or lack

10   thereof of any individual town.  Nothing about 666 makes

11   it a violation, again, if it happens in Norwich versus

12   Greenwich or whatever dichotomy that played out before the

13   grand jury.  We think that's why this motion being granted

14   is important pretrial to make sure that that doesn't

15   happen in front of the jury at trial.

16             THE COURT:  Thank you.

17             I think the next motion on the list is

18   Number 318.  It's the joint motion to exclude evidence or

19   argument about the absence of board vote for corporate

20   retreats.

21             I'll just tell you, my concern about that is it

22   seems like it's expressly alleged in the indictment and

23   that I don't see why the absence of a board vote may be

24   not dispositive but isn't at the least relevant to a

25   determination of this issue of corporate purpose or

1    personal purpose.

2              MR. HEALY:  Your Honor, our point is that no

3    formal vote was required.  We see that in CMEEC's bylaws

4    and the membership agreement.  I gather the government

5    acknowledges that reality.  They go back to the idea that

6    they're purely personal without corporate value,

7    et cetera.

8              The purpose of our motion, Your Honor, is that

9    the government can't be allowed to mislead the jury into

10   drawing a nefarious inference from the absence of a board

11   vote that pursuant to the bylaws --

12             THE COURT:  If there had been a vote -- if there

13   had been a board vote, wouldn't you be arguing what's the

14   complaint here?  The board actually voted on this.

15             MR. HEALY:  And the board did vote on budgets

16   and other things.  That's necessarily going to be part of

17   the case, Your Honor.  This motion is directed --

18             THE COURT:  I understand what the motion is

19   directed at.  If you can try to answer the question.

20             If there had been a board vote specifically

21   authorizing these retreats, wouldn't you point that out as

22   part of your case?

23             MR. HEALY:  I suppose we would, Your Honor.  It

24   would have been a --

25             THE COURT:  And would you do that because it was

 1    relevant?

 2            MR. HEALY:  And Your Honor, what this is going

 3    to get to and I think is part of the problem is what we'd

 4    have to talk about if the government gets into that, that

 5    under the prior CEO when they took corporate retreats,

 6    they did not have a board vote either.  So our point is

 7    that there's not an inference that should be drawn from

 8    the absence of a board vote and that's why there's

 9    evidentiary value in limiting this now.  Is that

10    responsive to Your Honor's question?

11            THE COURT:  I understand the argument you'll

12    make about the limited relevance it has.  I just have a

13    hard time seeing how it's altogether irrelevant especially

14    when it's expressly alleged in the indictment.

15            I'll hear from the government on this.

16            MS. KARWAN:  Your Honor, I note that we spent a

17    lot of time on the motion to dismiss arguing that it was

18    in fact board approved, so it would seem it had relevance

19    then.  The government believes it is relevant for the

20    reasons that the Court articulated.

21            THE COURT:  Anything else, Mr. Healy?

22            MR. HEALY:  No, Your Honor.

23            THE COURT:  All right.  That gets us to

24    Number 319, which is to preclude testimony from government

25    witnesses who lack personal knowledge and also, I think,

1     combined to preclude expert testimony from the government

2     witnesses.  This motion focuses, I think, on three

3     different witnesses:  It appears George Adair, who

4     previously served as Wallingford Director of Public

5     Utilities; Richard Hendershot, also of Wallingford; David

6     Meisinger, who now serves as CEO of CMEEC.  Possibly

7     within the scope of the motion, I think it's referenced in

8     a footnote possibly, are auditor witnesses from

9     Blum Shapiro.

10              So who would like to --

11              MR. HEALY:  Your Honor, I won't belabor the

12    points made in our papers.  I think we explained the basis

13    for our concerns.  Some of these witnesses either were not

14    board members at the time, don't have relevant testimony

15    to offer then, or, to use Mr. Meisinger as an example of a

16    CEO hired at CMEEC several years after this occurred.  And

17    our concern is that they're going to be brought in to

18    editorialize about things that are prior to the period of

19    time, that aren't relevant, or well after the period of

20    time that can't possibly be relevant to the essential

21    question, again, of whether or not these retreats had a

22    corporate value.  The purpose of our motion was to alert

23    the Court to that issue with respect to several of these

24    witnesses and make sure their testimony would be cabined

25    if they're allowed to testify at all only to things that

1    are relevant to the period of time at issue.

2            THE COURT:  Now that you've seen the

3    government's response, though, how is Mr. Adiar not

4    relevant?

5            MR. HEALY:  Because, Your Honor, Wallingford

6    isn't part of the official board of this period of time.

7    My concern with Mr. Adiar, Your Honor, is they're going to

8    have him testify pursuant to this memorandum of interview

9    where he's drawing conclusions about accounting and other

10   things that aren't within the scope of what his charge is

11   to do, and that's very different than the type of case law

12   we reference to where if there's an in-house person, and

13   there will be testimony from people who worked in the

14   accounting department at CMEEC, if the government wants to

15   adduce witness testimony about CMEEC's books and records,

16   that's the type of witnesses that will have the personal

17   knowledge, not Mr. Adair.

18           THE COURT:  I see.

19           And for Richard Hendershot, is he altogether

20   irrelevant?

21           MR. HEALY:  Again, we view him as more

22   editorializing on things for which he doesn't have a basis

23   to opine, Your Honor.

24           THE COURT:  But would it be okay if the

25   government calls him if they ask him only about matters of

 1   which he has firsthand knowledge and don't invite him to

 2   express opinions?

 3            MR. HEALY:  And that they're relevant to the

 4   question before the jury, yes, Your Honor.

 5            THE COURT:  All right.

 6            Government on this one?

 7            MS. LEVENS:  Your Honor, I think our papers lay

 8   out our position on these witnesses.  I'm happy to address

 9   any questions that you might have.

10            THE COURT:  Well, Mr. Meisinger, it sounds to me

11   like you're interested in bringing Mr. Meisinger to come

12   in and testify about how the grass is much greener, how

13   things are great now that the prior management is gone

14   from CMEEC.  It struck me that that -- I had real

15   questions about the propriety of that kind of testimony.

16   Can you help me understand why it would be appropriate?

17            MS. LEVENS:  Certainly, your Honor.

18            Before I get to that particular question, I

19   think there are plenty of other topics that Mr. Meisinger

20   would also have completely relevant and unobjectionable

21   testimony to offer.

22            THE COURT:  You feature in your response,

23   though, how Mr. Meisinger is going to talk about how

24   things are hunky-dory, I think, much better now.  I'd have

25   a concern about whether -- are you basically calling him

1  in kind of to say, you know, I came into this company and

2  I changed this, changed that.  I just had a hard time

3  understanding why everything that he knows about

4  presumably was after all of the relevant events in the

5  case, maybe they're not, or maybe there is some overlap,

6  you can tell me that.  But I had a hard time understanding

7  why the government should be permitted to have somebody

8  come in like that.

9          For example, if he's going to say CMEEC's

10  revenues doubled or CMEEC's bottom line was a lot better

11  after we came in, I came in, why would that be causally

12  related to the expenses, significant as they were, for

13  these particular trips?  And if they are going to be, if

14  you're going to say, well, they're related or at least

15  it's relevant to showing that, aren't you basically really

16  making an ultimate harm argument that's not an element of

17  a 666 crime?  And doesn't that then become prejudicial,

18  403 prejudicial?

19          MS. LEVENS:  Certainly.  I think I understand

20  Your Honor's concern.

21          Just to put this in the larger context of what

22  we intend to offer through Mr. Meisinger, that would just

23  be one small part of his testimony.  I'm going to get to

24  explaining the relevance of that in a minute, but just to

25  back up and put it in context, the other aspect is that

1    the jury needs to understand what CMEEC is and how it

2    operates and just nuts and bolts what it is and why we're

3    here talking about it.  Part of Mr. Meisinger's testimony

4    is to offer that background about CMEEC itself.  In the

5    government's view, the current sitting CEO is an

6    appropriate person to do that as the person running the

7    public corporation at this time.

8              Turning to Your Honor's concerns about the

9    actual financial performance, I don't think that we

10   anticipate going through line by line and sort of saying

11   have revenues increased since you've been there, have

12   profits increased, have costs gone down, things like that.

13   But to the extent that defendants want to argue that these

14   trips did have some corporate benefit and some corporate

15   purpose, in their eyes helped with team building and

16   that's good for the bottom line, then I think it is

17   relevant to have Mr. Meisinger say we don't take those

18   trips now and we're doing just fine.

19             THE COURT:  I see.

20             MS. LEVENS:  Thank you.

21             THE COURT:  Anything else?

22             MR. HEALY:  Your Honor, our position is that

23   that type of testimony along the lines that the

24   government's counsel just stated, that we're not going on

25   any retreats now and doing just fine, that that is not

1    relevant.

2              THE COURT:  I can't figure out how it matters to

3    the element of the crime here.  I didn't think that one of

4    the elements is you have to show that it really hurt.  And

5    it seems like the jury can make that evaluation, well, of

6    course it's going to hurt an entity if they spend hundreds

7    of thousands of dollars on personal -- if the jury were to

8    so conclude on personal expenses and not corporate

9    expenses.  Of course that's a jury issue.

10             MR. HEALY:  Right, Your Honor.  Our view is that

11   is a jury issue based on the evidence of what actually

12   happened or didn't happen, not on what may be after the

13   fact.

14             THE COURT:  I want to ask the government, are

15   you intending to offer or to try to bring out expert-like

16   testimony?  I understand you may be calling people who

17   have training.  They're accountants.  They work for

18   Blum Shapiro.  Mr. Meisinger, presumably, is a corporate

19   executive who has training as that and not some other kind

20   of training.  But are you sensitive to the fact that the

21   defendants have said you haven't noticed a single expert

22   in the case, you can't bring in a witness to start

23   testifying, basically giving expert opinion testimony?

24             MS. KARWAN:  Your Honor, we are sensitive to

25   that.  A lot of these arguments are really anticipating

1  arguments that the defendants have made.  For example, in

2  public statement or before some of these investigations

3  that these were auditor approved or auditor sanctioned.

4  So it's to really anticipate those types of arguments.

5  But we expect very layman-level explanations.  For

6  example, from the auditors, this is what we were asked to

7  do, this is what we did and, frankly, the propriety of the

8  trips or impropriety is not something that we weighed in

9  on.  And similar with Mr. Meisinger, it was anticipating a

10 defense argument that we were doing so well that we -- you

11 know, it was okay for us to do this.  We made CMEEC so

12 much money that a little bit --

13         THE COURT:  We'll come up to that motion in a

14 moment.

15         MS. KARWAN:  But assuming that those -- you

16 know, the jury is instructed with respect to the elements

17 of 666 and something like an offset argument is not

18 appropriate, we don't think we need to reach these.  If

19 the defendants were to suggest through cross-examination,

20 we might ask the Court to revisit.

21         THE COURT:  Thank you.

22         Anything else on this motion?

23         MR. HEALY:  None, Your Honor.

24         THE COURT:  All right.

25         I think I've got Number 320 which is the motion

1    to preclude alleged reimbursement of expenses by the City

2    of Norwich.

3              MR. HEALY:  Yes, Your Honor.  And this is

4    related to the point you heard with Mr. Murphy before.

5    These reimbursements were to NPU which is not the City of

6    Norwich, in our view, for the reasons discussed there.

7              If Your Honor has questions about these

8    particular reimbursements, we can talk about that.  I

9    don't want to belabor the point beyond the larger legal

10   issue that I know you spent time with Mr. Murphy.

11             THE COURT:  Apart from that distinct legal issue

12   in terms of difference between the utility and the town,

13   isn't basically the issue, though, of what any of the

14   defendants is receiving, whether you call it a

15   reimbursement or a stipend, for expenses in connection

16   with board service generally or in connection with

17   participation on these trips, isn't that all relevant at

18   least?

19             MR. HEALY:  Our issue, Your Honor, is that it's

20   not a City of Norwich reimbursement.  That's the basis of

21   our motion.  That's the point of our --

22             THE COURT:  You're basically saying the

23   government's evidence is wrong and so you don't want to

24   see it.

25             MR. HEALY:  It is wrong, correct.  And it was

 1   not charged as a separate 666 violation for the reasons

 2   you've heard in connection with those other motions.

 3            THE COURT:  I understand.  Thank you.

 4            Government.

 5            MS. LEVENS:  So I think just to clarify, as I

 6   think we state in our papers, we're not arguing that those

 7   reimbursements are separate 666 violations, they're not

 8   charge as such.  But in addition to the general relevance

 9   of receiving reimbursement, it's also directly relevant to

10   the allegations in the indictment that Mr. Bilda offered

11   public statements that not a dime of rate payer or

12   taxpayer money were used.  The fact that he's getting

13   reimbursement from NPU, whether that's directly from NPU

14   or comes from the City of Norwich, lends to the veracity

15   of that statement.

16            THE COURT:  All right, thank you.

17            The next one is Number 321, it's again

18   Mr. Bilda's motion to preclude evidence in support of

19   inaccurate allegation of board compensation.

20            Anything to add?

21            MR. HEALY:  Yes, Your Honor.  And I think this

22   can be very simple.

23            Our problem is that the indictment alleges that

24   CMEEC board members received $500 or $600, whatever the

25   number is, for attending board meetings.  That is untrue

1    as to Mr. Bilda.  I gather from the government's papers

2    there's no dispute about that.  Per the membership

3    agreement, John Bilda didn't personally receive anything.

4    Rather, those funds were deposited to NPU's rate

5    stabilization fund.  So our problem is, bottom line being

6    the indictment is wrong as to Mr. Bilda.  Our concern is

7    the government providing information to the jury that is

8    not true and it would wrongly indicate that he personally

9    received funds for attending board meetings when in fact

10   that went instead into the rate stabilization fund.  So

11   that's the simple issue we wanted to take up in that

12   motion.

13            THE COURT:  So your concern is more about the

14   indictment doesn't have it right, but I think you're not

15   suggesting the evidence is wrong on this, that the

16   government anticipates --

17            MR. HEALY:  The indictment speaks broadly and I

18   think says all board members received funds.  For people

19   who aren't like Mr. Bilda employed by an NPU, they do

20   receive that nominal fee.  Our problem is we don't want

21   the jury to receive the suggestion that Mr. Bilda received

22   in his personal name funds that went instead by operation

23   of the membership agreement to the rate stabilization

24   fund.

25            THE COURT:  I understand.

1          Government.

2          MS. LEVENS:  Your Honor, unless you had

3    questions about our motion --

4          THE COURT:  Are you going to introduce evidence

5    to suggest that Mr. Bilda received exactly the same amount

6    as the others or is your evidence going to make clear that

7    it was less than that?

8          MS. LEVENS:  The evidence will show the amount

9    that directly is associated with Mr. Bilda.  There were

10   different amounts for different board members, but the

11   evidence we have will show exactly what amount of money in

12   a stipend was attributable to Mr. Bilda.

13         THE COURT:  I see.  And you're not going to

14   argue at some later point that he was getting more?

15         MS. LEVENS:  No.  The evidence will speak for

16   itself, Your Honor.

17         THE COURT:  Thank you.

18         The next one is Number 322, it looks like it's a

19   motion by at least I think four of the five defendants to

20   preclude evidence of misconduct by the fifth defendant.

21   And I understand that that would be moot, because this

22   alleged misconduct by Mr. Sullivan is not going to be

23   brought up by the government unless the door is opened?

24         MS. KARWAN:  Yes, that's my understanding.

25   Obviously we disclosed it, Your Honor, and asked if anyone

1    was going to use it for impeachment that we be allowed to

2    front it.  The only issue we could possibly tie in is if

3    Mr. Sullivan alleges withdrawal from the conspiracy which

4    would tie to his reasons for leaving the board of

5    directors.  And we don't know what Mr. Sullivan's

6    intentions are with respect to that.

7            THE COURT:  This ties in to the Number 336, I

8    think, which is a separate motion to preclude evidence of

9    acts taken by Mr. Sullivan after October 2015 when he

10   resigned from the CMEEC board.

11           MS. KARWAN:  That's correct.  The government's

12   position is there is no withdrawal from the conspiracy at

13   that point.  That's an affirmative defense.  If

14   Mr. Sullivan wanted to pursue that he did affirmatively

15   withdraw, the government might in a very sanitized way

16   offer evidence of no, no, no, that isn't why you withdrew

17   from the CMEEC board.

18           THE COURT:  For other reasons.  All right.

19   Thank you.

20           Mr. LaLima.

21           MR. LaLIMA:  We do intend to claim withdrawal,

22   Your Honor.  Happy to address it when 366 comes up.  Or we

23   can address it now.

24           THE COURT:  You might do that since they're so

25   related.  Tell me why, then, if you're claiming that his

1    acts amounted to withdrawal, why it wouldn't be fair game

2    for the government to point to other reasons that suggest

3    it really wasn't a withdrawal.

4                MR. LaLIMA:  Yes, Your Honor.

5                Addressing that, I'm not aware of anything that

6    requires that the withdrawal be for the sole purpose of

7    leaving the criminal conduct.  You can -- there are cases

8    regarding retirement.  There's one case where a person

9    alleged that he had been imprisoned and that that was

10   withdrawal.  That was rejected, but that was not rejected

11   because of the fact that he was imprisoned.  So I don't

12   believe -- we can still claim withdrawal, Your Honor, even

13   if he withdrew from the conspiracy at the same time he

14   resigned for other reasons.  If he both resigned and

15   withdrew at the same time, there's no requirement that he

16   had to resign just because of the criminal conspiracy.

17   And so we would object to any of that evidence coming in.

18   Just from us saying that Mr. Sullivan resigned from the

19   company, he had no further involvement in this conspiracy

20   after fall 2015, he did not go on the trips, he did not

21   benefit from the trips, he no longer participated and

22   helped plan them, so therefore he withdrew.  I don't think

23   it's a fair response for the government to then say now

24   we're going to put in that he withdrew because of

25   allegations against him.  That's very inflammatory.  It's

1    prejudicial.  I don't think it's relevant to the

2    withdrawal question at all.  And I also think it obviously

3    prejudices Mr. Sullivan, but it prejudices all the other

4    defendants as well.

5         So I think we should be able to claim withdrawal

6    and claim all the facts required for withdrawal, an

7    affirmative act, lack of benefit from the conspiracy, no

8    further participation, we should be able to claim all

9    those elements.  That should not open the door to the

10   allegations against Mr. Sullivan at the time.

11        THE COURT:  Is your argument for withdrawal

12   simply the fact that he's no longer a board member?

13        MR. LaLIMA:  No longer a board member, but also

14   no further involvement in the conspiracy.  I'm aware of

15   the law that says -- part of it is that he's no longer a

16   board member, he's no longer in a position to contribute

17   to the conspiracy because he no longer has any of the

18   powers that come with being part of the corporation or the

19   board.  If he attended a trip after that, I would

20   understand the claim he's still getting benefits from it.

21   If he had helped plan a trip or participated in a trip or

22   helped engage in the cover-up, he did none of those

23   things.  I'm aware of no credible allegations that he

24   contributed to this conspiracy after the withdrawal date.

25   It's not just his resignation, but it is the fact that

1     after that date his involvement with these trips stops.

2              THE COURT:  So what evidence are you trying to

3     stop then?

4              MR. LaLIMA:  I'm sorry?

5              THE COURT:  What evidence are you trying to

6     preclude?  Are you saying that the government -- I'm not

7     clear what it is you're trying to preclude.

8              MR. LaLIMA:  On this issue, Your Honor, on this

9     narrow motion that was filed by Mr. Bilda's attorneys,

10    we're trying to preclude the evidence that Mr. Sullivan

11    resigned because of allegations of harassment against him.

12             THE COURT:  I get that.  I'm sorry, I misstated

13    the question.

14             In terms of your withdrawal motion, the later

15    motion, I'm not clear what it is -- that's Number 336 --

16    what you're trying to preclude acts that are taken after

17    October 2013, but I'm not clear what it is you're trying

18    to stop the government from bringing in other than any

19    acts of, you know, the alleged misconduct.

20             MR. LaLIMA:  I think any acts by coconspirators

21    or statements by coconspirators after the date of his

22    withdrawal can no longer be used against Mr. Sullivan.  I

23    believe it's -- we do have the rule in there, Your Honor.

24    And so no longer -- the acts and declarations of

25    coconspirators no longer apply to Mr. Sullivan after his

1    resignation, so that evidence should be precluded and

2    cannot be used against him.  The acts and the

3    participation in any of the facts regarding the 2016 trip,

4    that's obviously under the same acts and declarations of

5    coconspirators, but the 2016 trip facts cannot be used

6    against Mr. Sullivan.  It's after his withdrawal.  It's

7    after his planning.  I note that his resignation from the

8    board predated even the voting on the 2016 budget.  The

9    2016 budget was voted on I believe in November 2015.  He

10   resigned in October 2015.  Even getting away from the

11   specific planning of the trips, he did not even approve

12   the budget for those trips which was approved a month

13   after he left.  So I believe the 2016 trip should not be

14   used against him as well.

15           If I may have a moment, Your Honor, with

16   cocounsel.

17           THE COURT:  Certainly.

18               (Pause.)

19           MR. LaLIMA:  2016 is out as well as any aiding

20   and abetting liability against Mr. Sullivan I think should

21   be out as well.

22           THE COURT:  I take it then you want -- you want

23   me to tell the jury, then, right from the outset that

24   anything that happened after October 2015 can't be

25   considered against Mr. Sullivan.  And if I did do that,

1  doesn't that pre-judge the issue upon which you have the

2  affirmative duty to show that he withdrew?

3          MR. LaLIMA:  I think we should get that

4  instruction.  I think there's a way to formulate that

5  instruction.  To sort of give uncontested facts,

6  Mr. Sullivan resigned in October 2015.  I think -- I think

7  ultimately I don't think there's going to be any question

8  about the facts here of withdrawal.  It's really going to

9  be a legal question for Your Honor.  I think the facts are

10  uncontested.  He withdrew, he did not attend any further

11  trips, did not benefit from those trips.  I understand the

12  government in its motion says that -- or in its response

13  to the motion does say he continued to aid and abet the

14  trips, but I'm unaware of any evidence that supports that.

15  And I think they say he helped craft talking points at one

16  point.  He's on an email chain, his old email, but he

17  never responds to the email at all.  So I don't see how

18  that pulls him back to the conspiracy either by receiving

19  email that he may not have even read.  So ultimately I

20  think, Your Honor, the withdrawal is going to be a legal

21  question for you rather than a factual question.  There

22  are no facts in dispute, I believe, on that.

23          THE COURT:  I see.  Okay.  All right.

24          Anything from the government on this, on these

25  two motions?

1            MS. LEVENS:  Certainly, Your Honor.  I'll just

2    focus on the withdrawal issue for a second.

3            I think the Second Circuit case law is fairly

4    clear that resignation from a company alone is not enough.

5    I think that's even less the case when we're not charging

6    that CMEEC itself was a criminal enterprise.

7            And just to some of want factual points about

8    Mr. Sullivan's involvement, I think at the time that

9    Mr. Sullivan resigned in October of 2015, the 2016

10   Kentucky Derby trip had already been prepaid.  So I think

11   the 2016 trip is fair game just because of that.  But at

12   the same time I think, as I've said, the case law is

13   fairly clear that it's, A, the defendant's burden and, B,

14   resignation is not enough.  So I think the only fact that

15   we have in front of us that they've proffered in their

16   motions about why Mr. Sullivan has withdrawn from the

17   conspiracy is his resignation from CMEEC.

18           Tying back to the other motion, I think it's

19   certainly relevant to evaluating withdrawal that that

20   resignation had nothing to do, apparently, with a desire

21   to cease criminal conduct.  Following his resignation, he

22   did not make a clean breast to the authorities.  And he

23   also didn't communicate to his coconspirators that what I

24   think you guys are doing is wrong.  I'm withdrawing from

25   this because I've had it with the criminal conduct.

1          Other than that, I'll just rest on the case law

2   that we cited.

3          THE COURT:  I take it in conspiracy cases in

4   which you try to attempt to introduce the coconspirator

5   statements and acts in furtherance, ordinarily the Court

6   does have to make a *Geaney* finding; is that right?

7          MS. LEVENS:  Yes.  I believe that is,

8   Your Honor.

9          THE COURT:  So you would prompt the Court to do

10  so during the course of the trial, I take it?

11         MS. LEVENS:  Yes.

12         THE COURT:  Okay.  All right.

13         And then do you otherwise agree that the issue

14  of withdrawal is a legal issue for the Court to decide?

15         MS. LEVENS:  Well, I think it's the defendant's

16  burden to offer facts that would support an affirmative

17  defensive is withdrawal that would justify giving a

18  withdrawal instruction to the jury, Your Honor.  Once the

19  facts are presented, then Your Honor would make the

20  determination that that burden has been cleared to offer

21  the instruction in the first place, and the jury would be

22  instructed on withdrawal and make the determination for

23  themselves.

24         THE COURT:  Okay.  All right.  Thank you.

25         MS. LEVENS:  Thank you.

1              MR. LaLIMA:  If I could briefly?

2              THE COURT:  Yes.

3              MR. LaLIMA:  Your Honor, we're not relying

4    solely on his resignation for the withdrawal.  That's the

5    affirmative act we're relying.  There's nothing in the

6    case law that requires that the only way you can fully

7    withdraw is to come clean to the authorities or sort of

8    have an intervention with your coconspirators.  There is a

9    requirement that you can either come clean to authorities

10   or, according to *Eppolito*, communication of the

11   abandonment in a manner reasonably calculated to reach

12   coconspirators.  That also's the resignation letter that

13   goes out to the rest of the board and his coconspirators,

14   to use the government's term.  So that's reasonably

15   calculated to reach them.  They know he has withdrawn.  So

16   that's part of it.

17             Additionally, the defendant must not take

18   subsequent acts to promote the conspiracy or receive any

19   additional benefits.  That is again *Eppolito* but it's

20   quoting *U.S. v. Berger*, 224 F.3d at 118.

21             So we're not just relying on the resignation,

22   but also that he communicated the resignation, that he did

23   not take subsequent acts and that he did not receive

24   additional benefits.  So that's what we're relying on for

25   the withdrawal.

1          THE COURT:  Thank you.

2          I know we're getting close to 1:15 which is

3   about the time we need to stop for the day.  I wanted to

4   see if I can quickly cover 323 and 324.  323 is a motion

5   to preclude 404(b) evidence of prior alleged bad acts of

6   one of the defendants, Mr. Rankin.  It wasn't clear to me

7   what that is, what the acts are.

8          Mr. Healy, did you have more to say?

9          MR. HEALY:  Your Honor, we had filed that in

10  concert with our motion to preclude the evidence against

11  codefendant Sullivan, the theory being the government

12  appears to be intending to offer some evidence along the

13  lines we just discussed with Mr. Sullivan.  There's other

14  evidence that --

15          THE COURT:  Oh, okay.

16          MR. HEALY:  We just wanted to offer that issue

17  to the Court that in addition to their motion in the

18  context of a joint trial with other defendants who aren't

19  party to the allegations the government would seek to

20  introduce with respect to Mr. Rankin, that that's not fair

21  to do in a joint trial.

22          THE COURT:  I see.  Maybe you could consult with

23  counsel a little bit more on that.  It doesn't really say

24  that in the motion.  So I'm not sure what -- it's not

25  specific to the alleged acts.

 1              MR. HEALY:  Okay.  Our intent was simply then to

 2    sort of tuck in behind the substantive motions they had

 3    made, Your Honor.  We're happy to refile something if

 4    Your Honor would like that clarified.  We'll proceed in

 5    whatever course Your Honor would like.

 6              THE COURT:  I'm not sure how I grant the motion

 7    in the present state.  If you have more to elaborate on,

 8    you're welcome to do that.

 9              MR. HEALY:  Okay, Your Honor.  Thank you.

10              THE COURT:  And then the last is I think -- I'm

11    not sure if it's going to be an issue, but it's a joint

12    motion in limine to preclude evidence of a reference to

13    the CMEEC's indemnification and payment of legal fees.  As

14    I understand, the government does not intend to go into

15    that area unless the door is opened.  And I assume -- as I

16    always make clear, whenever I allow a party or suggest

17    that the party may revisit an issue if the door is opened,

18    what I mean is that if you believe the door has been

19    opened, then you need to ask for a sidebar or alert the

20    Court in advance.  You can't say I think the door's been

21    opened and march through it.

22              MS. KARWAN:  Understood, Your Honor.

23              THE COURT:  Okay.  So it sounds like that's not

24    really in dispute, that motion, for now.

25              Great.  All right.  I think we have -- it's

1   1:15.  I know we have more to cover.  We've made pretty

2   good progress today.

3          Anything the parties want to raise with me now

4   before we're back together tomorrow morning?

5          MR. NOBLE:  Judge, just for clarity's sake, will

6   we get rulings from Your Honor on at least some of these

7   motions that may affect how the parties open?  And we can

8   provide a list of those.

9          THE COURT:  I intend to try to rule on as many

10   of these motions as I can before the start of evidence in

11   the case.  It could be later this week.  It might be this

12   weekend.  But my hope is to give you as much guidance as I

13   can.

14          MR. NOBLE:  Thank you, Your Honor.

15          MR. ROSENTHAL:  Your Honor, is there anything we

16   need to know -- and there's been a lot of things flying

17   around about exhibits, whether cross-examination exhibits

18   need to be marked.  I don't know if that's been taken up

19   already.  Since we're picking a jury tomorrow --

20          THE COURT:  If you're showing a witness a

21   document, it's usually a good idea to mark it for

22   identification.

23          MR. ROSENTHAL:  But not ahead of time.

24          THE COURT:  I couldn't hear you, sir.

25          MR. ROSENTHAL:  I can check with Donna on this.

1    Maybe everybody else is clear on this.  I know the

2    government had a motion you granted to have until I think

3    it's today to amend their exhibit list, and I'm thinking

4    from the defense side the exhibits that we've been

5    processing, whether impeachment exhibits need to be in to

6    the Court by a certain date.

7            THE COURT:  I'm not sure that I need the

8    impeachment exhibits in advance, unless you anticipate

9    that it's raising an issue that the Court should resolve

10   before you do so.

11           MR. ROSENTHAL:  Thank you.

12           THE COURT:  I'm not sure I can conduct and

13   should conduct my own independent review of each and every

14   document.  But if you consider that you have a particular

15   document that's questionable in terms of the Court might

16   question or may flag an objection if it's used for

17   impeachment purposes, I'm not sure what nature it would

18   have, it would be a good idea to advise the Court.

19           MR. ROSENTHAL:  Thank you, Your Honor.

20           THE COURT:  Does the government have additional

21   concerns about the scope of disclosure you're receiving

22   from defense?

23           MS. KARWAN:  Well, Your Honor, we have some

24   concerns that we're receiving documents we believe were

25   responsive to the grand jury subpoena from defense counsel

1    that has received them from CMEEC as opposed to getting

2    them directly from counsel for CMEEC.  And we're not

3    getting those in a format with metadata and things like

4    that.  I thought this had all been cleared up under the

5    Court's 502(d) orders that we would just be getting the

6    same documents that were being provided by CMEEC to

7    defense counsel.  It's probably a better issue to bring up

8    when Mr. Martini is here.

9              THE COURT:  If you could communicate with him.

10   If there's a need for the Court to do something further,

11   happy to hear the argument.

12             MS. KARWAN:  To the extent that something is

13   going to be used at trial, the government believes that it

14   is entitled to see that ahead of time.  And the defendants

15   have been making regular disclosures, so we assume that

16   would be the case.

17             THE COURT:  Is that even for impeachment

18   purposes of a witness?

19             MS. KARWAN:  No, Your Honor.  I'm suggesting if

20   somebody is offering as part of a defense case.

21   Obviously, our case in chief, we made the disclosures.

22             THE COURT:  Understood.  Okay.

23             Mr. Dow?

24             MR. DOW:  Last item.  I want to loop back.  I

25   guess the lists will be available for us for jurors?

 1             THE COURT:  I hope so.  We've been a little busy

 2     right now.  But Ms. Barry, when she's available, I think

 3     she'll be able to help you get ahold of that list.

 4             MR. DOW:  It's 8:30 tomorrow?

 5             THE COURT:  8:30.  Not here, though.  It's

 6     downstairs, right below us.  Exactly.

 7             Anything else?

 8             Thank you all.  We'll see you in the morning.

 9                  (Proceedings adjourned at 1:19 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4         RE: UNITED STATES OF AMERICA v. DREW RANKIN, ET AL.

5                        No. 3:18CR272(JAM)

6

7              I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing Pages 1 through 132 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                        _____
                                  /s/

18                   DIANA HUNTINGTON, RDR, CRR
                       Official Court Reporter
19                 United States District Court
                   141 Church Street, Room 147
20                 New Haven, Connecticut 06510
                          (860) 463-3180
21

22

23

24

25